SECURITIES INVESTOR PROTECTION CORP.
*v.* BARBOUR ET AL.

No. 73–2055.  Argued March 17–18, 1975—Decided May 19, 1975

Marshall, J., delivered the opinion of the Court, in which Burger, C. J., and Brennan, Stewart, White, Blackmun, Powell, and Rehnquist, JJ., joined. Douglas, J., dissented.

*Wilfred R. Caron* argued the cause for petitioner. With him on the briefs was *Theodore H. Focht.*

*W. Ovid Collins, Jr.,* argued the cause and filed a brief for respondent Barbour. *Solicitor General Bork, William L. Patton, Lawrence E. Nerheim,* and *David Ferber* filed briefs for respondent Securities and Exchange Commission.

Mr. Justice Marshall delivered the opinion of the Court.

The Securities Investor Protection Corp. (SIPC) was established by Congress as a nonprofit membership corporation for the purpose, *inter alia,* of providing financial relief to the customers of failing broker-dealers with whom they had left cash or securities on deposit. The question presented by this case is whether such customers have an implied private right of action under the Securities Investor Protection Act of 1970 (Act or SIPA), 84 Stat. 1636, 15 U. S. C. § 78aaa *et seq.,*

to compel the SIPC to exercise its statutory authority for their benefit.

I

In December 1970 the Securities and Exchange Commission (SEC) filed a complaint in District Court against Guaranty Bond and Securities Corp., a registered broker-dealer, to enjoin continued violation of the Commission's net capital and other rules. On January 6, 1971, the District Court issued a preliminary injunction, and on January 29 it granted the Commission's motion for appointment of a receiver to wind up the affairs of Guaranty Bond. James C. Barbour (hereafter respondent) was appointed receiver.

On April 6, 1972, respondent, alleging that customers of Guaranty Bond would sustain a loss at least equal to the costs of administering the receivership, obtained from the court an order directing the SEC and SIPC to show cause "why the remedies afforded by the [SIPA] should not be made available in this proceeding." In its answer the SEC took the position that respondent had not demonstrated that Guaranty's customers would in fact sustain any loss since it appeared that the receiver would have a cause of action for damages or restitution against Guaranty's parent company and principals. The SIPC, on the other hand, challenged the receiver's standing to maintain an action to compel its intervention and, in direct opposition to the position of the SEC, argued that Guaranty's insolvency prior to the December 30, 1970, date on which the SIPA took effect meant that application of the Act to this case would give it an unlawful retroactive effect.

The District Court upheld the receiver's right of action, but denied relief on the ground that Guaranty's hopeless insolvency prior to the effective date of the SIPA rendered the Act inapplicable. The Court of Appeals for

the Sixth Circuit reversed. Since Guaranty had conducted 101 transactions after December 30, and the SEC did not move to prevent its carrying on business as a broker-dealer until January 6, it held that Guaranty qualified as a broker-dealer on the effective date of the Act. The court then rejected the SIPC's argument that the provision for SEC enforcement actions to compel the SIPC to perform its functions was meant to be exclusive of such actions by protected customers or their representative, and remanded the case for further proceedings. We granted certiorari, limited to the questions whether customers have an implied right of action to compel the SIPC to act and, if so, whether a receiver has standing to maintain it. 419 U. S. 894 (1974). Since we now reverse the Court of Appeals on the ground that no implied right of action exists, we do not address the second question.

## II

Following a period of great expansion in the 1960's, the securities industry experienced a business contraction that led to the failure or instability of a significant number of brokerage firms. Customers of failed firms found their cash and securities on deposit either dissipated or tied up in lengthy bankruptcy proceedings. In addition to its disastrous effects on customer assets and investor confidence, this situation also threatened a "domino effect" involving otherwise solvent brokers that had substantial open transactions with firms that failed. Congress enacted the SIPA to arrest this process, restore investor confidence in the capital markets, and upgrade the financial responsibility requirements for registered brokers and dealers. S. Rep. No. 91–1218, pp. 2–4 (1970); H. R. Rep. No. 91–1613, pp. 2–4 (1970).

The Act apportions responsibility for these tasks among the SEC, the securities industry self-regulatory

organizations, and the SIPC, a nonprofit, private membership corporation to which most registered brokers and dealers are required to belong. 15 U. S. C. § 78ccc. Most important for present purposes, the Act creates a new form of liquidation proceeding, applicable only to member firms, designed to accomplish the completion of open transactions and the speedy return of most customer property.

To this end, the SIPC is required to establish and maintain a fund for customer protection by laying assessments on the annual gross revenues of its members. The SEC and the securities industry self-regulatory organizations are required to notify the SIPC whenever it appears that a member is in or approaching financial difficulty. If the SIPC determines that a member has failed or is in danger of failing to meet its obligations to customers, and finds any one of five specified conditions suggestive of financial irresponsibility, then it "may apply to any court of competent jurisdiction . . . for a decree adjudicating that customers of such member are in need of the protection provided by [the Act]." § 78eee (a)(2).

The mere filing of an SIPC application gives the court in which it is filed exclusive jurisdiction over the member and its property, wherever located, and requires the court to stay "any pending bankruptcy, mortgage foreclosure, equity receivership, or other proceeding to reorganize, conserve, or liquidate the [member] or its property and any other suit against any receiver, conservator, or trustee of the [member] or its property." § 78eee (b) (2). If the SEC has pending any action against the member, it may, with the Commission's consent, be combined with the SIPC proceeding. If no such action is pending, the SEC may intervene as a party to the SIPC proceeding.

If the court finds any of the five conditions on which

an SIPC application may be based, it must grant the application and issue the decree, and appoint as trustee for the liquidation of the business and as attorney for the trustee, "such persons as SIPC shall specify." §§ 78eee (b)(1), (3).

The trustee is empowered and directed by the Act to return customer property, complete open transactions, enforce rights of subrogation, and liquidate the business of the member, § 78fff (a); he is not empowered to reorganize or rehabilitate the business. The SIPC is required to advance him such sums as are necessary to complete open transactions, and to accomplish the return of customer property up to a value of $50,000. § 78fff (f).

The role of the SEC in this scheme, insofar as relevant to the present case, is one of "plenary authority" to supervise the SIPC. S. Rep. No. 91–1218, *supra,* at 1; see H. R. Rep. No. 91–1613, *supra,* at 12. For example, it may disapprove in whole or in part any bylaw or rule adopted by the Board of Directors of the SIPC, or require the adoption of any rule it deems appropriate, in order to promote the public interest and the purposes of the Act. 15 U. S. C. § 78ccc (e). It may inspect and examine the SIPC's records and require that any information it deems appropriate be furnished to it, and it receives the corporation's annual report for inspection and transmission, with its comments, to the President and Congress. § 78ggg (c). It may participate in any liquidation proceeding initiated by the SIPC, but even more important, § 7 (b) of the Act, § 78ggg (b), provides:

"Enforcement of actions.—In the event of the refusal of SIPC to commit its funds or otherwise to act for the protection of customers of any member of SIPC, the Commission may apply to the district court of the United States in which the principal

office of SIPC is located for an order requiring SIPC to discharge its obligations under [the Act] and for such other relief as the court may deem appropriate to carry out the purposes of [the Act]."

It is against this background relationship between the SIPC and the SEC that we must approach the question whether, in addition to the Commission, a member's customers or their representative may seek in district court to compel the SIPC "to commit its funds or otherwise to act for the protection" of such customers.

### III

The respondent contends that since the SIPA does not in terms preclude a private cause of action at the instance of a member broker's customers, and since such customers are the intended beneficiaries of the Act, the Court should imply a right of action by which customers can compel the SIPC to discharge its obligations to them. As we said only last Term in analyzing a similar contention: "It goes without saying . . . that the inference of such a private cause of action not otherwise authorized by the statute must be consistent with the evident legislative intent and, of course, with the effectuation of the purposes intended to be served by the Act." *Passenger Corp.* v. *Passengers Assn.,* 414 U. S. 453, 457–458 (1974) (hereinafter *Amtrak*).

In *Amtrak* itself the petitioner was a corporation created by Congress to assume from private railroads certain intercity rail passenger service responsibilities. The respondent passenger association brought an action to enjoin the discontinuance of a particular service as announced by the corporation pursuant to its authority under § 404 (b)(2) of the Rail Passenger Service Act of 1970 (Amtrak Act), 45 U. S. C. § 564 (b)(2). That Act made express provision for suits against Amtrak to enforce its duties and obligations only "upon petition of the

Attorney General of the United States or, in a case involving a labor agreement, upon petition of any employee affected" by the agreement. 45 U. S. C. § 547 (a). There, as here, the plaintiff-respondent argued that statutory authorization for one type of action against the congressionally created corporation did not preclude another at the instance of the intended beneficiaries of the law.

The Court's analysis of the claim in *Amtrak* began with the observation that express statutory provision for one form of proceeding ordinarily implies that no other means of enforcement was intended by the Legislature. That implication would yield, however, to "clear contrary evidence of legislative intent," 414 U. S., at 458, for which we turned to the legislative history and the overall structure of the Amtrak Act.

Inspection revealed that the legislative history of the Amtrak Act was entirely consonant with the implication of the statutory language that no private right of action was intended.[1] The general structure and purpose of the Act gave further support to that conclusion. Congress had expected that, in creating an economically viable rail passenger system, some rail service would have to be discontinued by Amtrak; it had provided an efficient and expeditious means to that end, which seemed incompatible with an intent to allow a private action by any passenger affected by a discontinuance decision.[2]

---

[1] Both the Secretary of Transportation, who was given primary responsibility for implementing the law, and spokesmen for organized labor had interpreted the bill as enacted to preclude private actions other than those specifically authorized. The drafting subcommittee to which these views had been expressed found nothing in them to correct.

[2] See 414 U. S., at 462:

"If, however, [the Act] were to be interpreted as permitting private lawsuits to prevent the discontinuance of passenger trains, then the

Nor would the absence of a private right of action leave Amtrak free to disregard the public interest in its decisionmaking. In addition to investing the Attorney General with "authority to police the Amtrak system and to enforce the various duties and obligations imposed by the Act" by court action, Congress provided for "substantial scrutiny" over Amtrak's operations by requiring it to make periodic reports to Congress and the President and to open its books to the Comptroller General for auditing. 414 U. S., at 464.

The similarities between the present case and *Amtrak* are undeniable and for the respondent, we think, insurmountable. As with Amtrak, so with the SIPC, Congress has created a corporate entity to solve a public problem; it has provided for substantial supervision of its operations by an agency charged with protection of the public interest—here the SEC—and for enforcement by that agency in court of the obligations imposed upon the corporation. The corporation is required to report to Congress and the President, and to open its books and records to the SEC and the Comptroller General. Further, Congress has chartered the SIPC, unlike Amtrak, as a nonprofit corporation, and it has put its direction in the hands of a publicly chosen board of directors.

Beyond the inference to be drawn from the structure of the SIPC, there is no extrinsic evidence that Congress intended to allow an action such as that before us.[3] As

---

only effect of the Act in this regard would have been to substitute the federal district courts for the state or federal administrative bodies formerly required to pass upon proposed discontinuances."

[3] Respondent argues that because Congress provided that the SIPC can "sue and be sued, complain and defend, in its corporate name and through its own counsel, in any court, State, or Federal," 15 U. S. C. § 78ccc (b) (1), it must have contemplated occasions when an aggrieved customer of a member firm would be able to sue. In light of the specific terms of the more relevant section governing

the respondent concedes, there is no indication in the legislative history of the SIPA that Congress ever contemplated a private right of action parallel to that expressly given to the SEC. Additionally, as in *Amtrak,* it is clear that the overall structure and purpose of the SIPC scheme are incompatible with such an implied right.

Congress' primary purpose in enacting the SIPA and creating the SIPC was, of course, the protection of investors. It does not follow, however, that an implied right of action by investors who deem themselves to be in need of the Act's protection, is either necessary to or indeed capable of furthering that purpose.

The SIPC properly treats an application for the appointment of a receiver and liquidation of a brokerage firm as a last resort. It maintains an early-warning system and monitors the affairs of any firm that it is given reason to believe may be in danger of failure. Its experience to date demonstrates that more often than not an endangered firm will avoid collapse by infusion of new capital or merger with a stronger firm.[4] Even fail-

---

suits to compel the SIPC to act for the benefit of investors, that conclusion is unwarranted. It is also incompatible with the limitation of SEC actions "to the district court of the United States in which the principal office of SIPC is located." 15 U. S. C. § 78ggg (b). It would be anomalous for Congress to have centralized SEC suits for the apparent convenience of the SIPC while exposing the corporation to substantively identical suits by investors "in any court, State or Federal."

[4] Of the 266 firms brought to the attention of the SIPC by the exchanges, self-regulatory organizations, and the SEC between the effective date of the SIPA and the end of 1973, only 32 were subjected to SIPC liquidation as of December 31, 1973. Sixty-six withdrew from the business of carrying customer accounts, 26 self-liquidated, 20 became inactive without customer loss, 11 merged with other firms, 62 corrected their problems, and 49 remained under surveillance. SIPC 1973 Annual Report 17 (1974).

ing those alternatives, a firm may be able to liquidate under the supervision of one of the self-regulatory organizations, or the district court, without danger of loss to customers. The SIPC's policy, therefore, is to defer intervention "until there appear[s] to be no reasonable doubt that customers would need the protection of the Act." SIPC 1973 Annual Report 7 (1974). By this policy, the SIPC avoids unnecessarily engendering the costs of precipitate liquidations—the costs not only of administering the liquidation, but also of customer illiquidity and additional loss of confidence in the capital markets—without sacrifice of any customer protection that may ultimately prove necessary. A customer, by contrast, cannot be expected to consider, or have adequate information to consider, these public interests in timing his decision to apply to the courts.

The respondent in this case does not, of course, claim any right to make the decision that a firm should be liquidated; the Act makes that a judicial decision. He seeks only the right to ask the District Court to make that decision when both the SIPC and the SEC have refused or simply failed to do so. In practical effect, however, the difference is slight. Except with respect to the solidest of houses, the mere filing of an action predicated upon allegations of financial insecurity might often prove fatal.[5] Other customers could not be expected to leave

---

[5] See Freeman, Administrative Procedures, 22 Bus. Law. 891, 897 (1967): "The moment you bring a public proceeding against a broker-dealer who depends upon public confidence in his reputation, he is to all intents and purposes out of business." See sources collected at Freedman, Summary Action by Administrative Agencies, 40 U. Chi. L. Rev. 1, 33 n. 162 (1972), and Gellhorn, Adverse Publicity by Administrative Agencies, 86 Harv. L. Rev. 1380, 1394–1397 (1973). There may, of course, be less reason for public reaction to a private, as opposed to an SEC, suit to compel the SIPC's protective measures, but there is little reason to think that the investing public, with its assets at risk, would be interested in the distinction.

their cash and securities on deposit, nor other brokers to initiate new transactions that the firm might not be able to cover when due if a receiver is appointed, nor would suppliers be likely to continue dealing with such a firm. These consequences are too grave, and when unnecessary, too inimical to the purposes of the Act, for the Court to impute to Congress an intent to grant to every member of the investing public control over their occurrence. On the contrary, they seem to be the very sorts of considerations that motivated Congress to put the SIPC in the hands of a public board of directors, responsible to an agency experienced in regulation of the securities markets.[6]

We need not pause long over the distinctions between this case and those, such as *J. I. Case Co.* v. *Borak,* 377 U. S. 426 (1964), and *Allen* v. *State Board of Elections,* 393 U. S. 544 (1969), in which the Court held that an implied private cause of action was maintainable.

In *J. I. Case* a stockholder sought damages against his corporation for its alleged misrepresentations, violative of § 14 (a) of the Securities Exchange Act of 1934, in soliciting proxy votes for the approval of a merger. In light of the "broad remedial purposes" of the Act and the SEC's representation that private enforcement was necessary to effectuate those purposes, the Court held that the action for damages could be maintained.

---

[6] The sequence of events giving rise to this case provided no opportunity for a run on Guaranty because the attempt to compel the SIPC's intervention occurred after the firm had ceased doing business and had come within the jurisdiction of the District Court for liquidation, at the instance of the SEC. In these limited circumstances Congress could reasonably have provided for a private action by a receiver against the SIPC, but it did not and we are not at liberty to do so. There is, after all, a real difference between a court's implying a right of action to effectuate the purposes of a statute and its cutting a code of procedure out of whole cloth.

The Court first concluded that it was "clear that private parties have a right under § 27 [of the Act] to bring suit for violation of § 14 (a)," since § 27 specifically granted the district courts jurisdiction over " 'all suits in equity and actions at law brought to enforce any liability or duty created' " under the Act. 377 U. S., at 430–431. The more difficult question was whether the private parties, once in court, could seek damages as well as equitable relief. On this point, the Court agreed with the SEC that private enforcement of the proxy rules was a necessary supplement to SEC enforcement. Since there was no contrary indication from Congress, the Court so held, relying on the statement from *Bell* v. *Hood*, 327 U. S. 678, 684 (1946), that "where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done."

Unlike the Securities Exchange Act, the SIPA contains no standards of conduct that a private action could help to enforce, and it contains no general grant of jurisdiction to the district courts. As in *Amtrak*, a private right of action under the SIPA would be consistent neither with the legislative intent, nor with the effectuation of the purposes it is intended to serve.

The *Allen* case arose under the Voting Rights Act of 1965. The question there was whether a private citizen could sue to set aside a state or local election law on the ground of its repugnancy to the Act. The federal statute provided that the Attorney General may bring such suits, but was silent as to the rights of others. It was clear to the Court—and to the Attorney General—that the Act would be practically unenforceable against the many local governments subject to its strictures if only the Attorney General were authorized to sue. We thus found it "consistent with the broad purpose of the Act to allow

the individual citizen standing to insure that his city or county government complies with" its requirements. 393 U. S., at 557.

There is not the slightest reason to think that the SIPA, in contrast to the Voting Rights Act, imposes such burdens on the parties charged with its administration that Congress must either have intended their efforts to be supplemented by those of private investors or enacted a statute incapable of achieving its purpose. Instead of enlisting the aid of investors in achieving that purpose, Congress imposed upon the SEC, the exchanges, and the self-regulatory organizations the obligation to report to the SIPC any situation that might call for its intervention.

For these reasons we are unable to agree with the proposition that the customers of a member broker may sue to compel the SIPC to perform its statutory functions.[7] The judgment of the Court of Appeals is reversed, and the case is remanded to the District Court with instructions that the receiver's petition for an order to show cause be dismissed.

*It is so ordered.*

MR. JUSTICE DOUGLAS dissents.

---

[7] The SEC suggests in its brief that a determination by it not to proceed against the SIPC with respect to a member broker-dealer whose customers have incurred a loss of the type against which the SIPA is directed might be reviewable under the Administrative Procedure Act for an abuse of discretion. We need express no opinion on that matter today.