In re **ALBERT & MAGUIRE SECURITIES COMPANY, INC., Bankrupt.**

**INDUSTRIAL VALLEY BANK AND TRUST CO., Plaintiff,**

v.

**Donald M. COLLINS, Trustee, Defendant.**

Civ. A. No. 72–2044.

United States District Court, E. D. Pennsylvania.

Sept. 10, 1976.

---

Ira P. Tiger, Philadelphia, Pa., for IVB.

Donald M. Collins, Philadelphia, Pa., for Trustee.

Theodore H. Focht, Gen. Counsel, Wilfred R. Caron, Assoc. Gen. Counsel, William H. Seckinger, Senior Atty., Washington, D.C., for SIPC.

## MEMORANDUM OPINION

GORBEY, District Judge.

This case presents a novel issue arising out of the Albert & Maguire Securities Company, Inc. bankruptcy. The Trustee and the Securities Investor Protection Corporation (SIPC) have appealed from an order of Bankruptcy Judge Goldhaber, entered on May 18, 1976, with respect to facts established by a stipulation of the parties, attached as Exhibit 1, pages 24–30 inclusive, of the record on appeal.

A brief summary of the stipulated facts will serve to put the legal problems in their proper perspective. On May 10, 1972, Joseph and Helen Gradus opened a cash and carry account with Albert & Maguire Securities Co., Inc. (the debtor). All securities purchased by the debtor for that account were to be registered in their name and the proceeds of all sales made by the debtor were to be paid to the Graduses as received.

On or about July 12, 1972, a purchase order for one thousand shares of Pennsylvania Power & Light Company 8% preferred stock was given. On July 19, 1972, the debtor received from the Graduses $100,000, the full purchase price for the shares which were obtained by the debtor from another broker for $99,260.00.

On July 25, 1972, Pennsylvania Power & Light Company issued ten certificates in the names of the Graduses as joint tenants with the right of survivorship, each certificate being for 100 shares, and delivered them to the debtor, which converted them to its own use on July 27, 1972, when the debtor sold the shares to bona fide purchasers after having forged the signatures of the owners to the necessary stock transfer powers.

Signature guarantees were affixed to each of the forged powers by the debtor, by the Industrial Valley Bank and Trust Company (IVB) and others. IVB had no knowledge of the forgery, and was not a party to any fraudulent scheme or conversion by the debtor.

Upon receipt of the certificates and the forged stock powers, in good faith and in reliance on the IVB guarantees of the signatures, Pennsylvania Power & Light Company issued new certificates in the names of the bona fide purchasers.

The proceeds of the sale of the shares were received by the debtor and converted to its own use, no portion thereof being received by either IVB or the Graduses, whose demand for delivery of the stock during August and September, 1972, were unheeded by the debtor, which, on October 19, 1972 was adjudicated as a firm whose customers were in need of protection under the Securities Investor Protection Act (SIPA), and Donald M. Collins was appointed Trustee of the debtor. As a result of the conversion by the debtor of the stock, the Graduses were "customers" of the debtor, pursuant to the definition in Section 6(c)(2)(A)(ii) of SIPA, and entitled to the statutory benefits afforded by the Act to cash customers of the debtor.

On January 4, 1973, the Graduses filed a timely customer claim (claim no. 1217) in the instant proceedings for the shares. At the same time, the Graduses also made a claim against Pennsylvania Power & Light Company for the replacement of the shares, which company then advised IVB of the transfer of the stock to bona fide purchasers in reliance upon the forged signatures, and demanded that IVB reimburse it for any losses it might sustain, pursuant to its guarantee of said signatures.

The Graduses also asserted a claim against IVB based upon the latter's guarantee. Subsequently, on or about February 21, 1973, the Graduses and IVB entered into a written agreement, Exhibit L of the record, under which IVB agreed to obtain and deliver to the Graduses 1,000 shares of Pennsylvania Power & Light Company 8% preferred stock, registered in their names, to replace the converted stock, in consideration of which the Graduses assigned to IVB "any and all claims, rights or causes of action, and any proceeds thereof, which they or either of them have or may have against Broker or any other person, including, without limitation, SIPC, arising out of their purchase of the Preference Shares and the subsequent transfer thereof without the endorsement of Claimants . . . Any recovery by Bank on any Assigned Claim shall inure solely to the benefit of Bank . . .". (Record, Exhibit L, pp. 77–78)

Thereafter, IVB purchased 1,000 shares of stock of Pennsylvania Power & Light, paying a purchase price of $105,971.25 for the shares. Subsequently, on or about March 30, 1973 IVB delivered said stock to the Graduses, with the payment of $2,030, representing dividends payable on January, 1973, to shareholders of record on December 8, 1972 ($2,000 plus $30 interest thereon, and an additional sum of $500 in reimbursement for relevant counsel fees).

On June 14, 1973, IVB filed a proof of claim (claim no. 1326) in the instant proceedings, asserting, *inter alia,* a claim for $108,501.25, on account of the payment to the Graduses.

On December 20, 1973, and July 17, 1974, the Trustee filed objections to the Gradus' claim, neither of whom had been customers of IVB at any relevant time.

Pennsylvania Power and Light Company had at least one bank account with IVB and was at all relevant times a solvent corporation.

Bankruptcy Rule 302(d)(2) applies to the transfer of the Gradus' claim to IVB and the parties authorized the Trustee to petition the court herein to enter an order substituting IVB for the Graduses on claim no. 1217. Upon the entering of such an order, IVB will amend the claim it has filed in this proceeding in its own name, being claim no. 1326, to delete therefrom any claim with respect to the Graduses.

The Trustee acknowledges that IVB has a valid claim against the Estate of the Debtor herein to the extent of $108,501.25 on account of the Gradus' transaction but asserts that it is only a "general creditor claim". IVB contends, on the contrary, that the claim it owns is a "customer claim" which came to it by virtue of an assignment from the Graduses, whose status is "customer", therefor it is entitled to have the first $50,000 of its claim paid from funds advanced by SIPC in accordance with Sections 6(f) and 6(g) of SIPA, and the balance paid from the single and separate fund described in Section 6(c)(2)(B) of SIPA.

The difference between the Trustee's position and that of IVB, in terms of dollars and cents is that if the Trustee's position is upheld, the total distribution to IVB would be approximately $16,200 and if IVB's position is sustained, its total distribution will approximate $84,200, a difference of $68,000. Ninety-four percent of this additional distribution to IVB would be reflected in an increase of the net cost of these proceedings to SIPC; the remaining six percent of the

additional distribution to IVB would be the result of the reduction of distribution from the fund to other customer creditors. (Brief of defendant-appellant, p. 4)

The bankruptcy judge, on the basis of the stipulated facts, held that since, admittedly, the Graduses were "customers" of the debtor, by virtue of the assignment IVB became the owner of a "customer claim" and issued an order appropriate to such conclusion from which the appeal was taken by SIPC and the Trustee.

The single issue involved in this case is whether the Gradus assignment was effective to vest the bank with a preferred claim against the debtor's "single and separate fund" and for the special protection afforded customers from SIPC's funds.

It appears to be an oversimplification of the problem to conclude that, merely because by definition the Graduses were "customers" of the debtor, they had an enforceable preferred claim against SIPC to which IVB would succeed as their assignee, under ordinary contract law. Since the Act of 1970, 15 U.S.C. § 78aaa, *et seq.* does not expressly cover the situation here, and absent case law on the point, it is necessary to refer to the background against which Congress passed the statute here involved which we must now interpret.[1] What was the intent of Congress in passing SIPA? As pointed out by the Trustee,

"In the late 1960's a large number of securities brokers went into bankruptcy, after nearly forty years without any significant brokerage bankruptcies. As a result hundreds of thousands of brokerage customers who had on deposit at those brokers securities or cash had their property placed in jeopardy and removed from their control for long periods of time, although fortunately various emergency measures preserved them from ac-

---

1. "SIPA was not designed to provide full protection to all victims of a brokerage collapse." *SEC v. Packer, Wilbur & Co.*, 498 F.2d 978, 983 (2d Cir. 1974); *SEC Investor Protection v. Morgan, Kennedy & Co.*, 533 F.2d 1314 (2d Cir. 1976) holding that 108 employee-beneficiaries of a trust created under a profit-sharing plan are not "customers" and that, although there were three trustees, only one "customer" claim was involved; *SEC v. F.O. Baroff Company, Inc.*, 497 F.2d 280 (2d Cir. 1974) holding that a voluntary lender of securities to a failing brokerage house, who made his loan to solely help out the company, was not a customer within the meaning of SIPA.

tual loss. This situation threatened to destroy investor confidence and thereby destroy the capital markets in the United States which had been so successful in promoting the entire economy.

"The Congressional purpose was to be achieved by the creation of a corporation, SIPC, which was to be financed [except in the most grave catastrophe] by all securities brokers. There was thus created an arrangement similar to that provided to the customers of banks through the Federal Deposit Insurance Corporation. In fact, SIPC has always been funded by assessments against securities brokers based upon the amount of their customer activity. Therefore, an advance by SIPC to the trustee of a bankrupt broker for payment by the trustee to a *customer* of such broker is payment of funds collected from customers of all other securities brokers. In other words, all customers of all securities brokers are sharing the risks of the bankruptcy of any particular securities broker." Trustee's brief on appeal, pp. 5, 6.

Generally speaking then, the statutory purpose is aid to "customers" of a bankrupt brokerage house.[2] However, not all customers are treated alike. For example, the SIPC guarantee sets a maximum of $50,000, and then in Section 6(f)(1)(D) it is provided that:

"No such advance shall be made by SIPC to the trustee to pay or otherwise satisfy claims of any customer who is a broker, a dealer, or bank . . ."

Since by express provision Congress had declared a limitation with respect to three classes of customers who have been injured by the bankruptcy of a brokerage house, one class of which is herein involved, a bank, IVB, can it reasonably be urged that a bank such as IVB, which has sustained liability because in the course of its banking business it has guaranteed the validity of signatures on a stock transfer form which signatures turn out to be forgeries, is entitled to the advance? The bank, however, seeks to avoid its loss on a guarantee made in the normal course of its banking business, the prior guarantor being the bankrupt brokerage house, through the simple, but ingenuous, expedient of making good on its own guarantee and as part of the same transaction taking an assignment of a customer's claim. Without such an assignment, IVB would have only a general creditor's claim against the bankrupt debtor based upon its prior guarantee of the forged signatures. If successful, it would mean that the bank's losses up to $50,000 would be paid by SIPC whose resources have been created by assessments against United States security brokers, and with respect to the balance, a claim against those assets of the debtor which comprise the single and separate "fund" as defined in Section 6(c)(2)(B) of SIPA.

This is not a case where the customer will sustain a loss in excess of $50,000 unless he obtains a $50,000 advance from SIPC and the balance from the fund, and who assigns his claim against the debtor for value to an assignee who has no other relation to the matter. On the contrary, it is a situation in which a customer could sustain a loss not because of the bankruptcy of his broker, but because of his failure to resort, if necessary, to his legal remedy against the solvent issuer of the stock who transferred it to a bona fide purchaser on the basis of forged signatures.

■ Accordingly, the conclusion seems irresistible that, in view of the Congressional purpose of SIPA, it cannot logically be said that a customer has suffered a loss as a result of bankruptcy of his broker, where he has an existing remedy against a solvent third party.

■ Under the Uniform Commercial Code as adopted in Pennsylvania, 12A P.S. § 8–311, the issuer of the stock, Pennsylvania Power & Light Company, was liable to the Graduses for the transfer of their stock,

---

**2.** *Securities Investor Protection Corp. v. Barbour,* 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975).

pursuant to forged signatures, to good faith purchasers. That section of the statute is consistent with prior case law, it having been determined that a corporation is required to reissue stock to the owner where it transferred shares on a forged power of attorney. *Egan v. United Gas Improvement Co.,* 319 Pa. 17, 178 A. 683 (1935). 12A P.S. § 8–404(2) requires the issuer of stock to deliver new certificates to replace those transferred as a result of forgery In such a situation, the Graduses did not lose their securities but only the evidence of their ownership. The steps necessary to obtain new certificates from a recalcitrant issuer of stock may occasion some inconvenience, but such claim would not be the subject of a customer claim because, under the Act, customer claims exist only for the securities themselves or the cash deposits by customers with the broker. *SEC v. S. J. Salmon & Co., Inc.,* 375 F.Supp. 867 (S.D.N.Y.1974).

█ IVB got into the act because after the Graduses made claim against Pennsylvania Power & Light Company for replacement of the shares, the latter, recognizing its legal liability to replace the securities, advised IVB of the facts and demanded that IVB reimburse it for any losses it might sustain as a result of the transfers, on the basis of its guarantee of the signatures on the stock transfer forms. This IVB was reluctant to do, because at that point it would be unable to avoid a substantial financial loss since its only recourse would be against a prior guarantor, the bankrupt brokerage house. Such was the dismal prospect for the guaranteeing bank when, for some reason, the Graduses asserted a claim against IVB based on the latter's guarantee although 12A P.S. § 8–312(1) specifically provides that the warranties arising out of the guarantee are made only "to any person taking or dealing with the security in reliance on the guarantee". Thus we have the background for the

agreement made on February 21, 1973 between the Graduses and IVB (Exhibit L, pp. 75–78, record on appeal). The agreement recites, *inter alia,* that the

> "Claimants have asserted a claim against Bank, based upon Bank's signature guarantee of such endorsements. The parties have agreed to settle amicably, the Bank not admitting any liability, Claimants' claim against the Bank, and wish to set forth the terms upon which they have agreed to do so."

The agreement then provides, *inter alia,* that IVB will acquire and deliver 1,000 shares of Pennsylvania Power & Light Preference Stock 8% series in consideration of which Graduses assigned all of their rights to IVB including, without limitation their right against SIPC, the target of this loss-recouping law suit.

By this maneuver IVB sought to shift the loss which would fall upon it as a result of its guarantee to the Pennsylvania Power & Light Company arising out of its banking business, to SIPC. It has already been noted that SIPC is funded by assessments against securities brokers based upon the amount of their customer activity. The payment requested by IVB might also be at the expense of "the claims of approximately six customers [which] have not been fully satisfied because their claims exceeded [or were not eligible for] the extent to which SIPC is committed by the Act to make advances to the Trustee." (P. 11, Brief of defendant-appellant) Viewed in this manner, the approval of the court would require it to disregard the purpose of the statute which was designed for the protection of those expressly covered by the statute, customers who have suffered an actual loss because of a broker's bankruptcy.[3] On page 6 of the opinion below, page 94 of the record on appeal, is the statement:

> "It is clear that, if the legal waters were not muddied by the presence of IVB, and if the 'customers' being dealt with were

---

**3.** *S.E.C. v. Alan F. Hughes, Inc.,* 461 F.2d 974 (2d Cir. 1972); *S.E.C. v. Kenneth Bove & Co., Inc.,* 378 F.Supp. 697 (S.D.N.Y.1974); *S.E.C. v.*

*Albert & Maguire Securities Co., Inc.,* 378 F.Supp. 906 (E.D.Pa.1974).

the Graduses, SIPC would be obliged to advance to the trustee the necessary funds to meet the net equity claims of said 'customers' to a maximum of $50,-000.00."

This statement is inaccurate because it assumes the answer to a very important issue which led to litigation, and is contrary to the later paragraph in the opinion, at page 7, record, p. 95:

> "What is more, urge the trustee and SIPC, the Graduses had no claim to assign to IVB . . . ."

Section 6(c)(1) of SIPA, 15 U.S.C. § 78fff(c)(1) which relates to the application of the Bankruptcy Act is relied upon in support of the argument that the Gradus' claim should be accorded the same status it would receive under the Bankruptcy Act. To determine the status of assigned claims the opinion below refers to *Shropshire, Wooliff & Co. v. Bush*, 204 U.S. 186, 27 S.Ct. 178, 51 L.Ed. 436, *In Re: Dorr Pump & Mfg. Co.*, 125 F.2d 610 (7th Cir. 1942). In the first case the court held that since wage claims under Section 64 of the Bankruptcy Act were entitled to priority of payment, that the right of prior payment is attached to the *claim* of the wage earner and not to the person; accordingly, the assignee was entitled to priority of payment. In the second case, which made no reference to the *Shropshire* case, wage earners assigned their wage claims to assignees, the effect of which was to place the assignees in the shoes of the wage earner assignors. In the case *sub judice*, it is denied that the assignors actually had the claim which they purported to assign.

On page 11 of the bankruptcy judge's opinion, page 99 of the record on appeal, are excerpts from a very relevant statute, one which, in its entirety, shows very clearly that the bankruptcy cases relied upon the bankruptcy judge and the appellee, are not applicable. The excerpts follow:

> "The prohibition in § 6(f)(1)(D) of SIPA against SIPC's advances to the trustee to satisfy the claim of a bank is tempered by the qualification that such advances are

not proscribed if the ' . . . claims of such . . . bank against the debtor arise out of transactions for customers of such . . . bank . . . '"

From this he concludes that:

> "The obvious intent of this section is to preclude banks *inter alia*, which are acting in their own behalf as *'customers'* from the class to be benefited by the insurance provisions of SIPA. But where a bank's claim arises, not out of its purchase of stock from a debtor, but from its contractual obligation to a 'customer' of the debtor, its position as the assignee of the customer's claim is not affected by the proscription of this section."

In the part of the statute which is included in the excerpt the word "bank" is preceded by a very important adjective, *i.e.*, "such". The portion of the statute which was omitted is vital because it contains the words which explain the meaning of the word "such" as it relates to a bank.

The omitted portion follows:

> "No such advance shall be made by SIPC to the trustee to pay or otherwise satisfy claims of any *customer* who is a broker, or dealer, or *bank* other than to the extent that it shall be established to the satisfaction of the trustee . . . that claims of *such* broker, or dealer, or *bank* against the *debtor* arise out of transactions for *customers* of *such* dealer or broker or *bank*, in which event, each *such customer* of *such* broker or dealer or *bank* shall be deemed a separate customer of the debtor." (Emphasis supplied)

The statute in its entirety indicates quite clearly, contrary to the bankruptcy situation, that the limitation created applies to three classes of customers, of which banks are one. It shows very clearly the Congressional intention that the banks are to obtain no advance from SIPC, even if a bank is itself a customer of a bankrupt broker. A bank, however, as a customer, would participate in the "fund".

The sole exception to the proscription is where the bank, as a customer of the bro-

ker, was acting for one of its own customers. The required advance from SIPC in such situation would benefit the "customer" principal and not the agent bank.

A simple rule of statutory construction requires a conclusion that Congress, by expressly making only one exception, has by implication excluded all other situations, with the possible exception perhaps of a situation where an admitted customer of a bankrupt brokerage house who actually sustained a loss because of the bankruptcy, assigned for value his right to a bank having no other relation to the situation then that resulting from the assignment itself.

To require SIPC to make an advance to IVB would mean that its banking business loss arising from its guarantee to Pennsylvania Power & Light Company, has been shifted to SIPC, in favor of a bank which

was not even a customer of the bankrupt broker, and which would not be in the case at all except for the fact that its admitted remedy for a banking business loss is against the bankrupt broker on its prior guarantee of the signatures.

Since, with respect to claim no. 1217, IVB is not a customer as that term is defined in Section 6(c)(2)(A)(ii) of SIPA, and since the assignor customer sustained no loss [4] within the meaning of the statute as a result of the broker's bankruptcy, IVB as assignee, obtained no customer's claim for the value of the securities, it follows that the Trustee is not obliged to request from SIPA, nor is it obligated to make, an advance to the Trustee under Section 6(f) of said statute. The Trustee's objection to claim no. 1217 is sustained and the order appealed from must be reversed.

4. If owners of stock interest represented by certificates do not exercise their statutory right to obtain replacements from the issuer of the stock, such failure should be regarded as the real cause, or borrowing from the law of torts, the proximate cause, of their deprivation, and not the bankruptcy of their broker.

The Graduses did not have the statutory right to the $50,000 advancement from SIPC and to share in the "single and separate fund" as the result of the forgery; but they actually had and could assign a conditional right, i.e., a right as a "customer" if the issuer of the stock should become bankrupt, so that the statutory right would be worthless. If the condition which qualified the right actually occurred, it would be quite clear that the bankruptcy of the broker caused the loss. In the case *sub judice*, issuer is and continues to be a very solvent corporation.

Of course, the Graduses had a statutory right against Pennsylvania Power & Light Company for the delivery of new certificates to replace those transferred as the result of the broker's forgery. This right may have been assigned to IVB but because of its guarantee, in order to obtain delivery of the certificates, IVB was required by the issuer of the stock to make good on its guarantee.

On pages 12 and 13 of its brief in support of its position that the court should apply equitable principles to the solution of the problem, SIPC makes the following statements with which the court is in accord:

"The context for decision is that this is a bankruptcy case, and that courts of bankruptcy are essentially courts of equity and follow equitable principles.[28] In determining the allowability of claims or their priorities

the Court must '. . . sift the circumstances surrounding any claim to see that injustice or unfairness is not done.'[29] The equity powers of the Court should be invoked for a variety of reasons, including to assure 'that substance will not give way to form, that technical considerations will not prevent substantial justice from being done.'[30] In the final analysis, '. . . the broad purpose of the Bankruptcy Act is to bring about an equitable distribution of the bankrupt's estate.'[31]" (citations omitted)

(See also pages 4 to 6 of SIPC's reply brief)

Thus, if it be assumed that the assignment in question created, without attempting to articulate it, some kind of equitable right against SIPC, the court would refuse to give effect to it because it would result in an inequitable distribution of the bankrupt estate, inconsistent with Congressional purpose.

Also, if it be assumed *arguendo* that the Graduses had a customer claim against SIPC, although they had a statutory right against Pennsylvania Power & Light Company for the replacement of the shares of stock, the result would not be changed because under Section 78fff(g) of SIPA:

"Any payment or delivery of property pursuant to this subsection may be conditioned upon the trustee requiring claimants to execute in a form to be determined by the trustee, appropriate receipts, supporting affidavits, and assignments . . . .".

It would appear, therefore, that the trustee could legally refuse payment in a situation where claimant has assigned to another his right of recovery against a third party.