Zakiyyah H. ALAJI SALAHUDDIN, Plaintiff–Appellant,

v.

M. Sabir ALAJI, Defendant–Appellee.

Docket No. 97–9237.

United States Court of Appeals, Second Circuit.

Argued: April 11, 2000

Decided: Nov. 13, 2000

Robyn F. Tarnofsky, New York, New York (Jay L. Himes, Paul, Weiss, Rifkind, Wharton & Garrison, New York, New York, on the brief) for Plaintiff—Appellant.

Before: NEWMAN, KEARSE, and KATZMANN, Circuit Judges.

KEARSE, Circuit Judge:

Plaintiff Zakiyyah H. Alaji Salahuddin appeals from a judgment of the United States District Court for the Southern District of New York, Thomas P. Griesa, then-*Chief Judge*, dismissing her complaint against her former husband, defendant M. Sabir Alaji, for violation of the Child Support Recovery Act of 1992, as amended, 18 U.S.C. § 228 (Supp. IV 1998) ("CSRA" or the "Act"). The district court dismissed the complaint *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2) (1994) on the ground that the CSRA does not provide a private right of action. On appeal, Salahuddin contends that such a right should be inferred in order to assist the intended beneficiaries of the Act. For the reasons that follow, we affirm the judgment of dismissal.

## I. BACKGROUND

The complaint alleged the following. Prior to 1991, Salahuddin was married to Alaji; the couple had four children. In May 1991, Salahuddin, a New York State ("State") resident, filed for divorce in the State Supreme Court for Dutchess County. The court granted the divorce in April 1994 and awarded Salahuddin sole custody of the children. Alaji was granted liberal visitation rights and was ordered to pay $508 in biweekly child support, through the Dutchess County Support Collections Unit, for three of the children. Alaji fled the State and failed to make the ordered support payments.

Salahuddin sought enforcement of the support order through the State court and the county collections agency, but without success. In 1997, she commenced the present action *pro se*, alleging that Alaji had moved out of state and had willfully failed to pay more than $58,000 in court-ordered child-support payments. The complaint requested that Alaji be arrested, punished, and ordered to pay restitution to Salahuddin in the amount of $58,272.72 in accordance with the CSRA.

The district court dismissed the complaint *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2) (court may dismiss an action that is "frivolous" or "fails to state a claim on which relief may be granted"). The

court ruled that the CSRA, a criminal statute, does not create a private right of action. It noted further that Salahuddin, as a private citizen, had "no standing to prosecute criminal actions in federal court." Order of Dismissal dated July 30, 1997, at 1.

This appeal followed. As the question of the existence of a private right of action under the CSRA is a matter of first impression in this Court, we appointed counsel to represent Salahuddin on appeal. For the reasons that follow, we affirm the judgment of the district court.

## II. DISCUSSION

The CSRA, as amended through June 1998, imposes criminal liability on persons who have been ordered to pay support for their children living in another state and who have willfully failed to do so for extended periods or in substantial amounts. The offense is defined as follows:

> (a) **Offense.**—Any person who—
>
> (1) willfully fails to pay a support obligation with respect to a child who resides in another State, if such obligation has remained unpaid for a period longer than 1 year, or is greater than $5,000;
>
> (2) travels in interstate or foreign commerce with the intent to evade a support obligation, if such obligation has remained unpaid for a period longer than 1 year, or is greater than $5,000; or
>
> (3) willfully fails to pay a support obligation with respect to a child who resides in another State, if such obligation has remained unpaid for a period longer than 2 years, or is greater than $10,000;
>
> shall be punished as provided in subsection (c).

18 U.S.C. § 228(a). The term "support obligation" is defined as "any amount determined under a court order or an order of an administrative process pursuant to the law of a State or of an Indian tribe to be due from a person for the support and maintenance of a child or of a child and the parent with whom the child is living." *Id.* § 228(f)(3). The "punishment" prescribed in subsection (c) is a fine and/or up to six months' imprisonment for a first-time violation of subsection (a)(1), *see id.* § 228(c)(1); or a fine and/or up to two years' imprisonment for a subsequent violation of subsection (a)(1) or for any violation of subsection (a)(2) or (a)(3), *see id.* § 228(c)(2). In addition, subsection (d) provides that "[u]pon a conviction under this section, the court shall order restitution under [18 U.S.C.] section 3663A in an amount equal to the total unpaid support obligation as it exists at the time of sentencing." *Id.* § 228(d).

Salahuddin contends that the presence of the mandatory restitution provision demonstrates that Congress intended not simply to criminalize willful disregard of child-support obligations but also to provide monetary relief for the beneficiaries of those obligations. She asserts that the Department of Justice lacks sufficient funding to bring prosecutions against more than a small percentage of the parents who are in violation of the CSRA, and that "[i]nferring a private right of action from the CSRA in favor of custodial parents who seek restitution of payments owed under a state child support decree would advance" Congress's evident "intent to enforce the child support obligations of noncustodial parents living in different states from their children" (Salahuddin brief on appeal at 7). Although these assertions may be true, we remain unpersuaded that the language and history of the Act reveal Congressional intent to authorize a private right of action.

The CSRA does not expressly provide that a person entitled to a state-ordered support payment may bring a private action under the Act to obtain that payment. The question thus is whether such a private right of action is implied; that question, in turn, depends on whether it can reasonably be inferred that Congress in-

tended to create such a private remedy. *See, e.g., Karahalios v. National Federation of Federal Employees, Local 1263,* 489 U.S. 527, 532, 109 S.Ct. 1282, 103 L.Ed.2d 539 (1989); *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 15–16, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979) ("*Transamerica*"); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *Cannon v. University of Chicago,* 441 U.S. 677, 688, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).

In *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), which involved a private litigant's claim for damages for violation of a criminal statute that had not theretofore been thought to include a private remedy, the Supreme Court set out four factors to be considered: (1) whether the plaintiff is "one of the class for whose especial benefit the statute was enacted ...—that is, does the statute create a federal right in favor of the plaintiff"; (2) whether there is "any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one"; (3) whether it is "consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff"; and (4) whether the cause of action is "one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law." 422 U.S. at 78, 95 S.Ct. 2080 (internal quotation marks omitted).

In subsequent cases, the Court emphasized that the four *Cort* factors do not necessarily carry equal weight and that the "dispositive question" is whether Congress intended to create a private right of action. *Transamerica,* 444 U.S. at 24, 100 S.Ct. 242 (if that question is answered "in the negative, our inquiry is at an end"); *see, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 377–78, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982) ("Our cases subsequent to *Cort v. Ash* have plainly stated that our focus must be on the intent of Congress.... The key to

the inquiry is the intent of the Legislature." (internal quotation marks and footnote omitted)); *Touche Ross & Co. v. Redington,* 442 U.S. at 568, 99 S.Ct. 2479. "'Indeed, the first three factors discussed in *Cort*—the language and focus of the statute, its legislative history, and its purpose, see 422 U.S. at 78, 95 S.Ct. 2080— are ones traditionally relied upon in determining legislative intent.'" *Transamerica,* 444 U.S. at 24, 100 S.Ct. 242 (quoting *Touche Ross & Co. v. Redington,* 442 U.S. at 575–76, 99 S.Ct. 2479). "Unless such 'congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist.'" *Karahalios v. National Federation of Federal Employees, Local 1263,* 489 U.S. at 532–33, 109 S.Ct. 1282 (quoting *Thompson v. Thompson,* 484 U.S. 174, 179, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988)). The "ultimate issue is whether Congress intended to create a private right of action." *California v. Sierra Club,* 451 U.S. 287, 293, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981).

■ As an "'elemental canon'" of statutory construction, we are to be "especially reluctant" to imply a private right of action where the statute explicitly provides a different remedy. *Karahalios v. National Federation of Federal Employees, Local 1263,* 489 U.S. at 533, 109 S.Ct. 1282 (quoting *Transamerica,* 444 U.S. at 19, 100 S.Ct. 242). "In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate." *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,* 453 U.S. 1, 15, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981).

■ Further, "the mere fact that the statute was designed to protect [a certain group] does not require the implication of a private cause of action for damages on their behalf." *Transamerica,* 444 U.S. at 24, 100 S.Ct. 242 (citing *Touche Ross & Co. v. Redington,* 442 U.S. at 578, 99 S.Ct.

2479; *Cannon v. University of Chicago,* 441 U.S. at 690–93, 99 S.Ct. 1946; *Securities Investor Protection Corp. v. Barbour,* 421 U.S. 412, 421, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975)). Nor, absent indicia of Congressional intent to create a private right of action, need the court consider the practical likelihood that a private federal enforcement action would be useful in advancing the Congressional purpose. *See, e.g., Transamerica,* 444 U.S. at 23, 100 S.Ct. 242; *Touche Ross & Co. v. Redington,* 442 U.S. at 575, 99 S.Ct. 2479. Thus, when analysis of the first two *Cort* factors fails to reveal any congressional intent to create a private right of action, the final two factors need not be reached. *See, e.g., California v. Sierra Club,* 451 U.S. at 298, 101 S.Ct. 1775.

Applying the *Cort* factors to the CSRA, we are unable to conclude that Congress intended to create a private right of action. Although the Act's ultimate goal is to induce parents to support their children, the terms and history of the Act indicate that the mechanism chosen by Congress to achieve that end did not include creation of a private right of action.

As to the first *Cort* factor, although the Act's requirement that a convicted CSRA violator be ordered to pay restitution, *see* 18 U.S.C. § 228(d), plainly benefits custodial parents and their children who are entitled to support payments, the Act does not create any substantive rights or duties. Rather, the existence of the support obligation owing from the noncustodial parent to the custodial parent will have been established in the judicial or administrative proceedings of the pertinent state, *see id.* § 228(f)(3). Thus, as Salahuddin notes, the CSRA is concerned with interstate "enforcement of *pre-existing* child support obligations." (Salahuddin brief on appeal at 31 (emphasis in original)). The restitution to be ordered under the CSRA is the amount to which the custodial parent is entitled under a state order. The right to receive that amount is not a right created by the CSRA. Thus, we cannot infer from the language or structure of the Act an intent to create a private federal right.

■ As to the second *Cort* factor, although the legislative history of the CSRA leaves no doubt that the Act was intended to benefit custodial parents and their children who are entitled to support payments, that history contains no indication that Congress intended to create a private right of action as a means for securing that benefit. The original version of the CSRA, enacted in 1992, provided for a fine and/or up to six months' imprisonment for a parent's first offense of failure to pay more than $5,000 in state-ordered support for a child who lived in another state, or a failure to pay state-ordered support in any amount for more than a year; it provided for a fine and/or up to two years' imprisonment for a subsequent offense. The original Act, like the present version, also contained a requirement that a person convicted under the Act be ordered to pay the custodial parent restitution in the amount of support owing under the pertinent state order. The statute was enacted to alleviate the problems experienced by custodial parents in enforcing support orders against recalcitrant parents who had moved to other states. Although some attempts had been made by the states to develop reciprocal enforcement mechanisms and uniform state laws, *see* Uniform Reciprocal Enforcement of Support Act, 9B U.L.A. 553 (1958); Revised Uniform Reciprocal Enforcement of Support Act, 9B U.L.A. 381 (1968), the states' efforts at enforcement "outside their own boundaries" were typically "hobbled by a labyrinth of extradition laws and snarls of red[ ]tape," 138 Cong. Rec. H7325 (Aug. 4, 1992) (statement of Rep. Schumer); *see also* 137 Cong. Rec. S5502 (May 8, 1991) (statement of Sen. Shelby) (state enforcement procedures are "of little help when a runaway spouse crosses the State line"). As one sponsor of the 1992 legislation stated,

[a]t our hearings we heard of instance after instance where spouses, usually

husbands, did not want to pay, went to another State, waited just until the legal process· was able to catch up with him, and then went to another State and started the procedure all over again. Now this sounds very almost legal, but when you hear the mothers and see in our own mind's eye their children unable to get support, paying lawyers large sums of money, not only the financial wounds they suffer but the psychological wounds are enormous. And that is what this bill is intended to deal with.

138 Cong. Rec. H7325 (Aug. 4, 1992) (statement of Rep. Schumer). *See also id.* (statement of Rep. Schumer) ("We must help the States to collect the support these children desperately need by taking the incentive out of moving interstate to avoid payment."); *id.* at H7326–27 (statement of Rep. Ewing) (failure to receive child-support payments "is a tragedy for millions of single parents and the youngsters they raise alone.... We must pass this legislation for all those children and single parents who are living in poverty because of negligent parents who chose to ignore their responsibilities."); *id.* at H7327 (statement of Rep. Lloyd) (characterizing failure of noncustodial parents to fulfill their child-support obligations as "a national disgrace," and stating that "we can no longer turn our backs to the cries for help from parents, usually mothers, who are working hard to support their children while the fathers resume their lives elsewhere without concern for their own kids.").

Although these remarks make plain that the CSRA was intended to help custodial parents and their children who were being deprived of state-ordered payments, we have seen no statement that indicated any Congressional intent to give the beneficiaries themselves the right to bring suit. Rather, it appears that Congress intended the 1992 legislation to "help *the States* to collect" the delinquent support obligations, *id.* at H7325 (statement of Rep. Schumer) (emphasis added).

The CSRA was amended in 1998 by the Deadbeat Parents Punishment Act ("1998 Amendment") in order to subject miscreants to more severe punishment. The debates on that legislation too made it clear that assistance to custodial parents and children entitled to state-ordered support was the ultimate goal. *See, e.g.,* 144 Cong. Rec. at H3044 (May 12, 1998) (statement of Rep. McCollum) ("Mr. Speaker, children are at the heart of the need for this legislation. No child should go to bed hungry, miss a medical appointment, not have adequate housing or be deprived of quality education.... We have no greater responsibility than the protection, development and security of our children."). However, in the debates on the 1998 Amendment there was little mention of the provision for mandatory restitution—already in place as part of the original Act—and, as with the 1992 debates, the discussions provide no basis for an inference that Congress meant in 1998 to create a private right of action as a means to achieve its ultimate goal. Rather, the focus of the 1998 Amendment was simply the imposition of more severe criminal penalties for two purposes: (1) to encourage federal authorities to bring more prosecutions under the Act, and (2) to provide greater deterrence of failures to pay state-ordered support obligations.

First, the original Act's authorization of a maximum prison term of six months for a first offense made such an offense a misdemeanor, and sponsors of the bills that led to the 1998 Amendment noted that law enforcement agents and prosecutors were reluctant to expend their limited resources on misdemeanor prosecutions. *See, e.g.,* 144 Cong. Rec. at S5734 (June 5, 1998) (statement of Sen. DeWine) ("the Deadbeat Parents Punishment Act gives federal law enforcement an incentive to bring more of these cases against deadbeats by making this offense a felony.... Today, nonpayment of child support is a class B misdemeanor, and the Federal Bureau of Investigation is frustrated at having to chase deadbeats for just a class B misdemeanor. Federal prosecutors are

equally discouraged about trying misdemeanor cases."); 144 Cong. Rec. at H7591 (February 13, 1997) (statement of Rep. Hoyer) ("Police officers and prosecutors ... have found that current misdemeanor penalties do not adequately deal with more serious cases...."). The 1998 Amendment, while retaining misdemeanor status for some first offenses, made nonpayment for more prolonged periods or in higher amounts felonies, see Deadbeat Parents Punishment Act of 1998 § 2, Pub.L. No. 105–187, 112 Stat 618 (codified as amended at 18 U.S.C. §§ 228(a)(3), (c)(2)); the 1998 legislation also made it a felony to engage in interstate or foreign travel in order to evade a state-ordered support obligation if the obligation remained unpaid for more than one year or the amount was more than $5,000, see Deadbeat Parents Punishment Act of 1998 § 2, Pub.L. No. 105–187, 112 Stat 618 (codified as amended at 18 U.S.C. §§ 228(a)(2), (c)(2)).

Second, the increased penalties were intended to provide a greater disincentive for individuals who might otherwise be inclined to disregard their state-ordered support obligations, for "there is an important legal distinction in making this crime a felony. A felony conviction carries more than just a jail term. A convicted felon loses the right to vote, to be licensed in many professions, to hold public office and many other rights." 144 Cong. Rec. at H3045 (May 12, 1998) (statement of Rep. Roukema). "[S]ome [noncompliant parents] need a little extra incentive to fulfill their responsibilities. The threat of a year in prison and a felony conviction on their records, contained in this bill, provides that much needed incentive." 143 Cong. Rec. at S5734 (June 5, 1998) (statement of Sen. Kohl).

We have seen in the debates no indication, explicit or implicit, of an intention to create an additional compliance incentive by the authorization of private enforcement. Rather, the supporters of the 1998 legislation repeatedly referred only to enforcement by governmental agencies. See, e.g., 144 Cong. Rec. at H3044 (May 12, 1998) (statement of Rep. Hoyer) ("stiff-

en[ing the] penalties for deadbeat parents in egregious interstate cases of child support delinquency" will "*enable Federal authorities* to go after those who attempt to escape State-issued child support orders by fleeing across State lines" (emphasis added)); id. (statement of Rep. Hoyer) (bill is designed to "strengthen the *government's* ability to make parents fulfill their minimum moral and legal responsibility" (emphasis added)); id. at H3046 (statement of Rep. Gilman) (purpose of bill is to "*help the States*" hold delinquent parents accountable (emphasis added)); id. at H3045 (statement of Rep. Gilman) ("The purpose of this bill is *to help local law enforcement officials collect* ...." (emphasis added)).

Finally, we note that in 1994, Congress had debated instructing the Department of Justice to increase its CSRA prosecutions, and that various members of Congress commented that aggrieved custodial parents had failed to secure enforcement of their rights because they were shunted back and forth between state and federal officials. See, e.g., 140 Cong. Rec. S9425 (July 21, 1994) (statement of Sen. Shelby) ("[M]ost U.S. attorney's offices are turning away custodial parents who are not referred by State agencies even though there is a legitimate case for prosecution"; yet "there is little evidence that State agencies are aware of, or are even in the business of making these referrals. As a result, custodial parents seeking help under the law are caught in a continuing cycle of rejection, bouncing between the Federal and State authorities without satisfaction"). We have seen no comments suggesting any Congressional view that aggrieved custodial parents could have escaped the bureaucratic loop by initiating their own federal civil actions.

■ In sum, though the CSRA was intended to benefit custodial parents and children victimized by nonpayment of state-ordered support obligations, and although pursuit of private actions might further the goals of the Act, the Act does not create a federal right but merely crimi-

nalizes conduct that infringes the state-created rights. The legislative history of the 1992 legislation contains no indication that Congress intended the original Act to create a private right of action; the history of the 1998 Amendment contains no indication that Congress either believed it had created such a right in 1992 or meant to create such a right in 1998. Rather, the history of the Act as originally passed and as amended indicates that Congress envisioned enforcement only by governmental authorities and believed that it had thereby created the appropriate mechanism to achieve the Act's goals. The first two *Cort* factors, therefore, as applied to the CSRA, lead to the conclusion that Congress did not intend to create a private right of action. That conclusion ends the inquiry. In matters of statutory interpretation, this Court is bound to be faithful to legislative meaning. If there is to be a private right of action under the CSRA, it is up to Congress to provide it.

### CONCLUSION

We have considered all of Salahuddin's arguments on this appeal and find no basis for reversal. The judgment of the district court is affirmed.