**Goziam Thomas ATTOH, Petitioner,**

v.

**IMMIGRATION AND NATURALIZA-TION SERVICE, Respondent.**

No. 78–1654.

United States Court of Appeals, District of Columbia Circuit.

Argued June 5, 1979.

Decided Aug. 17, 1979.

John A. Kendrick, Washington, D. C., for petitioner.

Lauren S. Kahn, Atty., Dept. of Justice, Washington, D. C., for respondent.

Before WRIGHT, Chief Judge, BAZELON,* Circuit Judge, and PARKER,** District Judge.

Opinion for the court *per curiam.*

### PER CURIAM:

Petitioner Goziam Thomas Attoh, a citizen of Nigeria, seeks review of a deportation order issued by the Immigration and Naturalization Service (I&NS) on February 20, 1976, and of various administrative decisions declining to reopen or reconsider his situation. We conclude, based on the totality of circumstances in the case, that the proceedings against Attoh did not comport with due process of law. Accordingly, we remand for a new deportation hearing.

---

\* Circuit Judge BAZELON assumed senior status effective June 30, 1979.

\*\* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

## I

Some time around 7:00 A.M. on Thursday, February 19, 1976, two I&NS officers came to the door of petitioner's apartment in the District of Columbia and conveyed him to the I&NS District Office.[1] The precise chronology of the events that followed cannot be discerned with certainty from the record. What is clear is that Attoh offered some resistance and there was an altercation during which he was stripped, searched, and forcibly subdued. The episode left petitioner confined in a straitjacket in which he was to remain for four hours. One of the officers involved in the fray was treated for an injured toe.

At 3:30 that afternoon an I&NS officer served Attoh with a document entitled "ORDER TO SHOW CAUSE, NOTICE OF HEARING, AND WARRANT FOR ARREST OF ALIEN."[2] That document recited that petitioner had entered the United States on May 10, 1972 as a nonimmigrant student authorized to remain for two years, that on August 30, 1974 he was granted the privilege of voluntary departure, and that he failed to depart.[3] It contained a series of typed warnings—among them that any statements made by petitioner might be used against him, that he could (at his own

expense) retain counsel, and that at his deportation hearing he would be able to present evidence, cross-examine witnesses, and otherwise respond to the charges against him. The Order to Show Cause stated that Attoh was to appear before an Immigration Judge on March 5, 1976.[4] Several paragraphs later, however, it contained a section bearing the heading "REQUEST FOR PROMPT HEARING" which stated: "To expedite determination of my case, I request an immediate hearing, and waive any right I may have to more extended notice." Attoh signed beneath this statement. Neither the circumstances surrounding his decision to do so nor the temporal relationship between that decision and the fracas described above can be reliably determined.[5]

The following day, Friday, February 20, Attoh's deportation hearing was held. He had spent the preceding night in jail and appeared without counsel. The Immigration Judge notified him at the outset that he could retain an attorney if he so desired. Thereafter the judge asked, "What do you want to do about having a lawyer?"[6] No response is transcribed. The judge then stated, "You'll speak for yourself, all

---

1. These events were described at the subsequent deportation hearing by two officers and by petitioner himself. A transcript of that hearing appears in petitioner's appendix (App.) at 39 and in the Administrative Record (AR) at 32.

2. The Order to Show Cause is reproduced at App. 64–65, AR 84–85. The Certificate of Service at the bottom states that it was served on petitioner at 3:30 P.M. on February 19, 1976.

3. Section 244(e) of the Immigration and Nationality Act provides for voluntary departure as follows:

    The Attorney General may, in his discretion, permit any alien under deportation proceedings [with exceptions not relevant here] to depart voluntarily from the United States at his own expense in lieu of deportation if such alien shall establish to the satisfaction of the Attorney General that he is, and has been, a person of good moral character for at least five years immediately preceding his application for voluntary departure under this subsection.

    8 U.S.C. § 1254(e) (1976).

4. Pursuant to 8 C.F.R. § 242.1(b) (1978), an alien must be given at least seven days notice of the hearing date, except that where the issuing officer, in his discretion, believes that the "public interest, safety, or security so requires," he may give less notice. He may also schedule an earlier hearing "at the request of and for the convenience of the respondent." Attoh's order would have given him twice the statutory minimum period between service and hearing.

5. At oral argument counsel was unable to state with certainty the sequence of events. It seems likely, however, that the altercation and use of the straitjacket preceded Attoh's signing of the Order to Show Cause, which presumably occurred at about the time the order was served—3:30 P.M. *See* note 2 *supra*; App. 57–62, AR 49–54.

6. App. 39, AR 32.

right," [7] and proceeded to question petitioner about the charges set forth in the arrest warrant. Attoh conceded his Nigerian citizenship, entry on a student visa, and failure to depart after being granted leave to do so voluntarily.[8] The colloquy between the judge and petitioner then touched in a rambling fashion on various allegations concerning the latter's supposedly fraudulent marriage to an American citizen and his use of a false address on various immigration forms.[9] In the course of his often confused responses petitioner made a number of potentially prejudicial concessions and admissions. Two I&NS officers then testified concerning petitioner's arrest and the subsequent altercation, after which Attoh gave his own version of those events.[10] He indicated he had signed the request for immediate hearing on the Order to Show Cause because he was told he had to, claimed he was confused and scared, and asserted that he was not aware of the precise charges against him.

Following Attoh's account the Immigration Judge delivered his ruling.[11] He stated

that but for the post-arrest altercation this would have been a "border line case as to whether or not voluntary departure should be granted." [12] In light of that altercation, however, he concluded, "There is no longer any question that voluntary departure should be denied as a matter of administrative discretion, and the respondent will be ordered deported to Nigeria * * * ." [13] The judge then informed Attoh that he had ten days in which to appeal or, in the alternative, could immediately accept the decision as final. There followed a rather opaque discussion, at the close of which the judge concluded that petitioner did not wish to appeal.[14]

Petitioner retained his present counsel shortly thereafter and moved to reopen and reconsider the matter of voluntary departure. The Immigration Judge denied this motion, and Attoh unsuccessfully sought relief from the Board of Immigration Appeals. After trying in vain to persuade the Board to reopen the case, he petitioned for review in this court.[15]

7. *Id.*

8. App. 39–40, AR 32–33.

9. App. 40–56, AR 33–49. Only after six pages of testimony was an oath administered to Attoh, an oversight that appears to contravene 8 C.F.R. § 242.16(a) (1978).

10. App. 57–62, AR 49–54.

11. That ruling is set forth at App. 34–37, AR 79–82.

12. App. 36, AR 81.

13. App. 37, AR 82.

14. That discussion was transcribed as follows:
   IMMIGRATION JUDGE TO RESPONDENT:
   Q  Now Mr. Attoh, you have the right to appeal from this decision if you wish. You have ten days to file the appeal if you wish to appeal or you can accept the decision, in which case it will become final today.
   A  You said I have the right to appeal or . . .?
   Q  To a higher court.
   A  To a higher . . .
   OFF THE RECORD
   ON THE RECORD
   IMMIGRATION JUDGE TO RESPONDENT:
   Q  You want to go as soon as possible then back to Nigeria, is that correct?

   A  Right.
   Q  All right.
   OFF THE RECORD
   ON THE RECORD
   IMMIGRATION JUDGE: The respondent has stated in response to my question as to whether he wishes to appeal, that it is his desire to return to Nigeria as quickly as possible. I take this to mean that he does not wish to appeal. I consider, therefore, that appeal has been waived. The decision is final.
   THE HEARING IS CLOSED.
   App. 62–63, AR 54–55.

15. Although neither party has briefed it, a question might be raised as to our jurisdiction to review the actual deportation proceedings in the instant case. 8 U.S.C. § 1105a(a)(1) (1976) provides that "a petition for review may be filed not later than six months from the date of the final deportation order * * *." In the present case the deportation order was issued February 20, 1976. Appellant sought administrative review on February 25, 1976, and was denied such review on December 17, 1976. He appealed this denial on December 30, 1976, and that appeal was dismissed on November 23, 1977. He attempted to reopen the Board's decision by a petition filed February 28, 1978, and the Board declined to do so on May 26, 1978. The instant petition for review was filed on

## II

The preceding narrative, we believe, reveals a series of procedural errors and infirmities which combine to raise grave doubts about the fairness of the way petitioner was treated. Deportation proceedings are governed by 8 U.S.C. § 1252(b) (1976). That section provides in relevant part:

> * * * Proceedings before a special inquiry officer acting under the provisions of this section shall be in accordance with such regulations, not inconsistent with this chapter, as the Attorney General shall prescribe. Such regulations shall include requirements that—
>
> (1) the alien shall be given notice, reasonable under all the circumstances, of the nature of the charges against him and of the time and place at which the proceedings will be held;
>
> (2) the alien shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose;
>
> (3) the alien shall have a reasonable opportunity to examine the evidence against him, to present evidence in his own behalf, and to cross-examine witnesses presented by the Government; and
>
> (4) no decision of deportability shall be valid unless it is based upon reasonable[,] substantial, and probative evidence.
>
> The procedure so prescribed shall be the sole and exclusive procedure for determining the deportability of an alien under this section. * * *

These somewhat general requirements have been fleshed out in the administrative regulations with a number of fairly straightforward prophylactic rules. Yet in the case before us neither the rules nor the letter and spirit of the statute that underlies them appear to have been followed by I&NS officials.

When the Order to Show Cause was served on Attoh by I&NS officers, they were required by 8 C.F.R. § 242.1(c) (1978) to explain the contents of the order, advise him that any statements he made might be used against him, and advise him of his right to representation by counsel. Similar explanations and advisements are to accompany service of an arrest warrant under 8 C.F.R. § 242.2(a) (1978). Yet nothing in the record suggests that anything was explained or any warning given. Indeed, Attoh's own uncontradicted account of what happened provides an eloquent testimonial to the absence of understandable explanations, sober warnings, or meaningful advisements. He stated:

> [The officials] took me in a room. I wanted to know what my charge was.

---

July 14, 1978—more than six months after the Board's dismissal of his initial effort to obtain review and even longer after the original and purportedly final (*see* note 14 *supra*) deportation order. Nonetheless, we believe that 8 U.S.C. § 1105a(a)(1) poses no obstacle to our review of the deportation proceedings against petitioner in this case. The Ninth Circuit has concluded that "if the motion to reopen before the Board is within six months of the final order of deportation and the petition to this court is within six months of the denial of the motion * * * this court has jurisdiction to review both the final order of deportation and the denial of the motion to reopen." *Bregman v. Immigration and Naturalization Service*, 351 F.2d 401, 402–403 (9th Cir. 1965). *See also Woodby v. Immigration and Naturalization Service*, 385 U.S. 276, 286–287 n.20, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966) (noting Ninth Circuit holding in *Bregman, supra*). While the *Bregman* rule might well be troubling in a case where there have been repeated and arguably frivolous motions to reopen or reconsider, the present situation reveals no hint of such dilatory tactics. Indeed, there is every indication that petitioner moved from one procedural stage to the next with some dispatch. Between the February 20, 1976 order and the filing of the instant petition he has had matters pending before the agency for all but about five months and 11 days. Thus for present purposes we are content to adopt *Bregman* only insofar as it implicitly recognizes that intervening good faith petitions for administrative relief may toll or suspend the running of the time limit. We save for another day a variety of related questions, among them whether and under what circumstances a petitioner can obtain a new six-month period for each additional administrative maneuver. *See Fu Chen Hsiung and Tse Hai Hsiung v. Immigration and Naturalization Service*, (2d Cir. No. 79–4012, decided May 15, 1979.)

They told me to stay in the room, and some guys, three guys came into the room and they started smoking and the window wasn't open. The door was locked. And I opened the door and told them, you know, and a guy came and I told him please, that these three guys are smoking. I couldn't breathe, you know, nobody could breathe there. They were smoking and smoking and they opened it and told me to come out. And I came out and then Mr. Brigham [an I&NS officer] said he wanted my belongings and I said, okay. Before he said anything he gave me a slip of paper and told me to read and then he told me these are your rights. I said okay. Then he said I shall sign it. I couldn't but I was better not to sign that now and then try to see what I will do. He said you will have to sign it and I said, what is the charge against me? He said you have to sign it and I said, can I talk to somebody? He said, no and he said, since you don't want to talk come over and they took me to the other room there and then there was this guy and the other two guys. And they took me to a small cabinet room and they told me to pull off. . . . I became scared because they were pulling my pants and my shirt. I became scared. I said, what are you doing? What have I done? What have I done? Because if they had told me, well this is what you are charged for, this is what you have done, I would gladly, you know, willingly give myself up. I'm not a criminal. I will leave this country, you know. * * * [16]

This account also disposes of any contention that Attoh's signature on the Order to Show Cause suggests that he had been meaningfully advised of his rights. On the contrary, all indications are that that signature was neither knowing nor voluntary. Rather, it seems to have been a product of the very sorts of fear and confusion in the face of authority which it is the purpose of warning and advisement requirements to avoid.[17]

This absence of warnings, and the omnipresent overlay of coercion, is particularly disturbing in that it led quite directly to petitioner's presence in an expedited deportation hearing with neither time to prepare a defense nor counsel to assist him. But for his signature on the Order to Show Cause, he would have had a two-week interlude.[18] By regulation he was entitled to a minimum of one week unless waived.[19] And for reasons we have already discussed we cannot believe that his signature amounts to a satisfactory waiver in the circumstances of this case.

As for representation by counsel, he testified that he would have liked to talk to someone, yet no actual explanation of his right to retain a lawyer seems to have been given. And at the hearing this error was if anything compounded. Pursuant to 8 C.F.R. § 242.16(a) (1978) the Immigration Judge was required not only to advise Attoh of his right to retain an attorney, but also to "require him to state then and there whether he desires representation." Yet no such statement was made. The judge was further required by that regulation to advise Attoh that he would have an opportunity to examine and object to the evidence against him, to present evidence, and to cross-examine witnesses. He was told only of his right to offer evidence. And finally, the judge was required by 8 C.F.R. § 242.-16(d) (1978) to reiterate that Attoh had a right to counsel and to advise him that he could request a continuance whenever the I&NS attorney lodged additional charges or factual allegations in the course of the hearing. Yet the discussion roamed over a variety of allegations concerning Attoh's marriage and the veracity of the address he had supplied agency officials, and no such warnings were given.

Having examined all the circumstances of this case, we are persuaded that we are

---

16. App. 61–62, AR 53–54.

17. *Compare Miranda v. Arizona*, 384 U.S. 436, 445–458, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

18. *See* text at note 4 *supra.*

19. *See* note 4 *supra.*

dealing not with an isolated formal departure from prophylactic rules which can be relegated to insignificance by the balance of the proceedings, but rather with a series of mutually compounding errors that cannot be ignored. A frightened and confused alien was whisked away from his home one morning and found himself facing a deportation order the following afternoon. In the intervening hours he met no compassion, no understanding, and nothing resembling a scrupulous effort to follow procedures designed to deal with just such situations. Rather, at almost every stage when a warning ought to have been given it was omitted and the proceedings were hastened toward their seemingly inevitable conclusion. That the statute and regulations demand more is clear. Moreover, the Supreme Court has noted that the "traditional standards of fairness encompassed in due process of law" must be met before aliens may be expelled.[20] Further, it has made the following observation concerning deportation:

> Here the liberty of an individual is at stake. * * * We are dealing here with procedural requirements prescribed for the protection of the alien. Though deportation is not technically a criminal proceeding, it visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom. That deportation is a penalty—at times a most serious one—cannot be doubted. Meticulous care must be exercised lest the procedure by which he is deprived of that liberty not meet the essential standards of fairness.[21]

On the record before us we think this meticulous care has been conspicuously absent.[22] We accordingly remand for a new deportation hearing and other proceedings consistent with this opinion.

*So ordered.*

**20.** *See, e. g., Shaughnessy v. Mezei,* 345 U.S. 206, 212, 73 S.Ct. 625, 629, 97 L.Ed. 956 (1953) ("It is true that aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law." (citing cases)).

**21.** *Bridges v. Wixon,* 326 U.S. 135, 154, 65 S.Ct. 1443, 1453, 89 L.Ed. 2103 (1945).

**22.** A similar failure to comply with I&NS regulations led to a similar result in *Navia-Duran v. Immigration and Naturalization Service,* 568 F.2d 803 (1st Cir. 1977).