**Jose Olvera CHAIREZ, Plaintiff,**

**v.**

**The COUNTY OF VAN BUREN; Myron Southworth, Undersheriff of Van Buren County; both individually and in their official capacities; and the United States Immigration and Naturalization Service; Paul McKinnon, District Director, Detroit District; Paul Christopher, Assistant Director of Deportations; Jerald D. Jondall, Chief, Border Patrol; all individually and in their official capacities and William Duckham,**

---

Ronald Dowdy and Robert McNamara,
Defendants.

No. K 79–429.

United States District Court,
W. D. Michigan, S. D.

June 24, 1982.

Gail McCarthy & Vincent Beckman, Mich. Migrant Legal Assistance Project, Inc., Berrien Springs, Mich., Ronald Kirschenheiter, Mich. Migrant Legal Assistance Project, Inc., Grand Rapids, Mich., for plaintiff.

Ward S. Hamlin, Jr., Paw Paw, Mich., for county defendants.

Robert Greene, Grand Rapids, Mich., for federal defendants.

## OPINION

ENSLEN, District Judge.

Plaintiff has filed a Second Amended Complaint in this action which arose as a result of a stop and arrest by Defendants John Gaborik and John Baldwin.[1] He seeks relief against the federal Defendants under a *Bivens*-type theory for alleged violation of his constitutional rights, under 42 U.S.C. §§ 1985 and 1986, and under federal immigration laws and regulations. Currently, this matter is before the Court on Plaintiff's Motion for Partial Summary Judgment and Motion for Summary Judgment filed by Defendant, United States Immigration and Naturalization Services (INS). For purposes of these motions, a stipulated statement of facts has been agreed upon which provides as follows:

Plaintiff Jose Olvera Chairez is a migrant farmworker who, during the summer of 1979, was employed harvesting crops within the County of Van Buren, State of Michigan. On July 11, 1979, Plaintiff and co-worker, Julian Ramirez, were taking a lunch break and traveling together in the co-worker's pickup truck. While they were traveling, at approximately noon, Defendant Baldwin, Chief of Police for the City of Hartford, and Defendant Gaborik, Deputy Sheriff for the County of Van Buren, pulled the truck over to the side of the road. The reason given for stopping the vehicle is that Julian Ramirez had been mentioned as fitting the general description of a suspect being sought in connection with a criminal sexual assault case.

Baldwin and Gaborik approached the truck, after bringing it to a stop, with their guns drawn. Baldwin approached on the driver's side of the truck and asked the driver, Ramirez, for identification. A driver's license and other identification was pro-

duced by Ramirez thereby allowing Baldwin to immediately discern that Ramirez was the suspect being sought in connection with the aforestated criminal sexual assault investigation.

Gaborik, meanwhile, approached on the passenger side of the vehicle, identified himself, and asked the Plaintiff to step out of the truck. Plaintiff was then frisked in a search for weapons, was questioned by Gaborik regarding his immigration status, his place of birth, and was referred to by Gaborik as a "wetback". At the time of the questioning Gaborik did not inform Plaintiff of any rights.

At the conclusion of the questioning at the scene of the stop, Plaintiff was handcuffed and arrested under suspicion that he had effected an illegal entry into the United States. Following the arrest, Baldwin and Gaborik transported Ramirez and Plaintiff to Faulkner Farms where Baldwin explained to Plaintiff, through a translator, that he had been arrested because he had entered the country illegally and that he would be sent back to Mexico. Plaintiff was then transported from Faulkner Farms to the Hartford Police station.

Chief of Police Baldwin then placed a call, at approximately 1:00 p. m., July 11, to the Detroit office of the US Border Patrol from the Hartford police station and spoke with William L. Duckham. On July 11, 1979, William L. Duckham was employed as Deputy Chief Patrol Agent for the United States Border Patrol and was performing in that capacity. His superiors were Chief Patrol Agent Jerald Jondall and Regional Commissioner Gordon Ruth.

Baldwin informed Duckham that he had a subject in custody who he believed to be an "illegal alien", or an "undocumented person from Mexico". Duckham requested that Baldwin allow him to speak with Plaintiff over the telephone.

Plaintiff thereupon was subjected to a telephonic interrogation by Duckham who inquired about Plaintiff's name, parents,

---

1. Only the above captioned federal Defendants remain parties in this litigation, the remaining Defendants have previously settled any potential liability with the Plaintiff.

country of birth, documentation to be in the United States, and time and place of entry into this country. Prior to this questioning, Defendant Duckham admits that he did not inform Plaintiff of any rights.

At the conclusion of the telephonic interrogation Duckham spoke with Baldwin again and advised him that the subject was undocumented, that he was placing a hold on him, and that a confirming LEIN message would be sent.

After this interrogation Plaintiff was transported to the Van Buren County Jail, where he was booked and charged for "illegal entry", and thereafter incarcerated in the county jail. Plaintiff remained in jail without having a face-to-face interview with anyone from the Immigration and Naturalization Service or the US Border Patrol from July 11 until July 13, 1979.

Moreover, it was not until July 12, 1979, the day following the phone interrogation of Plaintiff by Defendant Duckham, that Duckham instructed Border Patrol Agent Ronald Dowdy to travel to the Van Buren County Jail to execute the necessary immigration documents for the processing of Plaintiff. Duckham supplemented this instruction by specifically instructing Dowdy to go to the Van Buren County Jail on July 13, 1979. That date was the first day anyone from INS made face-to-face contact with Plaintiff.

In order to process someone for Voluntary Departure it is necessary to execute forms I–213, I–274 and I–43; and, before Voluntary Departure may be executed, it is necessary for the person voluntarily departing the country to sign form I–274. Plaintiff, when arrested by the City and County officials on July 11, 1979, had not signed form I–274.

Furthermore, throughout Duckham's telephonic interrogation of Plaintiff on July 11, 1979, Duckham did not fill out any forms, or otherwise process the Plaintiff for Voluntary Departure. It was not until July 13, 1979, when US Border Patrol Agents Dowdy and McNamara had their face-to-face interview with Plaintiff, that the processing of Plaintiff began.

On July 13 Dowdy and McNamara, at the Van Buren County Jail, conducted an interrogation of Plaintiff. At this face-to-face interview Agent McNamara began the written processing of Plaintiff for Voluntary Departure. Following a lunch break, Dowdy and McNamara worked to complete the necessary forms from the answers they had obtained and continued to question the Plaintiff. However late in the afternoon of July 13, Voluntary Departure was withdrawn, and Plaintiff was thereupon served by McNamara with a Warrant of Arrest and Order to Show Cause. This suit subsequently ensued.

■ Before addressing the merits of the instant motions, it is important to understand, not only what is before the Court by way of these motions, but, more precisely, what is not before the Court. Only one federal Defendant has filed a Motion for Summary Judgment, that being the INS. Court records disclose that the remaining federal Defendants have not joined in that Motion or filed a Motion of their own. Yet a cursory review of INS's supplemental brief in support of its April 30, 1980 Motion for Summary Judgment reveals that the arguments raised therein have application not only to the INS but to all of the federal Defendants. Indeed, those Defendants implicitly request summary relief via this supplemental brief. Such relief cannot, however, be granted in the absence of a properly filed Motion. To grant summary relief in this fashion, the Court would, in essence, have to ignore the very purpose for which the Federal Rules of Civil Procedure were implemented, and great prejudice would unquestionably result to the Plaintiff's case. Accordingly, the Court is constrained to consider only those aspects of the arguments contained within the supplemental brief which pertain to the alleged liability of the INS. A summary disposition, if it is found to be justified, may only be granted to this federal Defendant.

For the most part, the supplemental brief centers upon the Constitutional claims asserted by the Plaintiff under *Bivens v.* 6

*Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Historically, while violations of constitutional rights have long stated a federal cause of action when the defendants were acting under color of state law, constitutional deprivations committed by federal officers often remained unredressed in the absence of statute. The Supreme Court created a remedy for the violation of Fourth Amendment rights in *Bivens* against these individual officers and has since recognized a cause of action under a *Bivens* rationale for violations of the Fifth and Eighth Amendments. See respectively *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) and *Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). This form of remedy, though, is available only against individual federal officials. The converse to this form of action is a suit against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.* Here, the plaintiff has filed suit against the INS, an agency of the United States, but has not brought that suit pursuant to 28 U.S.C. § 2671 *et seq.,* instead premising his action on an alleged violation of statutory rights. It is apparent therefore, that a discussion of *Bivens* has no application to the potential liability of the INS, and therefore, that portion of the argument in the supplemental brief must be disregarded.

The supplemental brief does posit an argument that concerns Defendant INS and hence merits this Court's attention: to wit; does the Immigration and Nationality Act creates a private cause of action for a violation thereof?

The question whether a statute creates a cause of action, either expressly or by implication, is basically a matter of statutory construction. *Touche Ross & Company v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979); *Cannon v. University of Chicago,* 441 U.S. 677, 688, 99 S.Ct. 1946, 1952, 60 L.Ed.2d 560 (1979). In *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975), the Supreme Court outlined a preferred approach for determining whether a private right of action should be implied from a federal statute. Four factors were thought relevant.[2] Although subsequent decisions have indicated that the implication of a private right of action "is limited solely to determining whether Congress intended to create the private right of action," *Touche Ross & Company v. Redington, supra,* 442 U.S. at 568, 99 S.Ct. at 2485, these four factors are "the criteria through which this intent could be discerned". *Davis v. Passman, supra,* 442 U.S. at 241, 99 S.Ct. at 2274. As the Supreme Court stated in *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 23, 100 S.Ct. 242, 249, 62 L.Ed.2d 146 (1979) quoting from *Touche Ross & Company v. Redington, supra* :

It is true that in *Cort v. Ash,* the Court set forth four factors that it considered 'relevant' in determining whether a private remedy is implicit in a statute not expressly providing one. But the Court did not decide that each of these factors

---

**2.** First, is the plaintiff 'one of the class for whose especial benefit the statute was enacted,' *Texas & Pacific R. Co. v. Rigsby,* 241 U.S. 33, 39 [36 S.Ct. 482, 484, 60 L.Ed. 874], (1916) —that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? See, e.g. *National Railroad Passenger Corp. v. National Assn. of Railroad Passengers,* 414 U.S. 453, 458, 460, [94 S.Ct. 690, 693, 694, 38 L.Ed.2d 646] (1974) (Amtrak). Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? See, e.g., *Amtrak, supra; Securities Investor Protection Corp. v. Barbour,* 421 U.S. 412, 423 [95 S.Ct. 1733, 1740, 44 L.Ed.2d 263] (1975); *Calhoun v. Harvey,* 379 U.S. 134, [85 S.Ct. 292, 13 L.Ed.2d 190] (1964). And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? See *Wheeldin v. Wheeler,* 373 U.S. 647, 652, [83 S.Ct. 1441, 1445, 10 L.Ed.2d 605] (1963); c.f. *J. I. Case Co. v. Borak,* 377 U.S. 426, 434, [84 S.Ct. 1555, 1560, 12 L.Ed.2d 423] (1964); *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 394–395, [91 S.Ct. 1999, 2003–2004, 29 L.Ed.2d 619] (1971); id., at 400, [91 S.Ct. 1999 at 2006, 29 L.Ed.2d 619] (Harlan, J., concurring in judgment). 422 U.S. at 78, 95 S.Ct. 2080 at 2087, 45 L.Ed.2d 26.

is entitled to equal weight. The central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action. Indeed, the first three factors discussed in *Cort*—the language and focus of the statute, its legislative history, and its purpose, see 422 U.S. at 78, [45 L.Ed.2d 26, 95 S.Ct. 2080 at 2087]—are ones traditionally relied upon in determining legislative intent. 422 U.S. at 575–576, 61 L.Ed.2d 82, 99 S.Ct. 2479 [at 2488–2489].

■ Proper application of the factors outlined in *Cort* to determine legislative intent clearly indicates that the Immigration and Nationality Act creates a private right of action. Specifically, 8 U.S.C. § 1357(a)(2) provides for such a cause. That statutory section states:

(a) Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—

\* \* \* \* \* \*

(2) to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, or expulsion of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, *but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their rights to enter or remain in the United States;* (Emphasis supplied).

In determining whether Plaintiff can assert a private cause of action under this subsection, "the threshold question under *Cort* is whether the statute was enacted for the benefit of a special class of which the Plaintiff is a member". *Cannon v. University of Chicago, supra,* 441 U.S. at 689, 99 S.Ct. at 1953. It is readily apparent that, § 1357(a)(2) was enacted to allow a specified officer or employee of the Immigration Service to arrest without a warrant an alien under certain enumerated circumstances. However, by the very terms of this subsection, aliens that are so arrested are granted the "benefit" of being examined "without unnecessary delay" by an officer of the Service so that such persons *right* to enter or remain in the United States is not abridged. This required procedure is a protection, afforded to aliens so arrested, from the potential pernicious exercise of this awesome warrantless arrest power by officers of the Service. As Plaintiff was arrested without a warrant and since § 1357(a)(2) was enacted in part to provide a benefit to such a person, the Court is of the opinion that the first prong of the *Cort* test is satisfied in this case.

The second inquiry under the *Cort* approach is whether there is evidence of an express or implicit legislative intent to negate the claimed private right of action. As the Court noted in *Cannon*:

(T)he legislative history of a statute that does not expressly create or deny a private remedy will typically be equally silent or ambiguous on the question. Therefore, in situations such as the present one 'in which it is clear that federal law has granted a class of persons certain rights, it is not necessary to show an intention to create a private cause of action, although an explicit purpose to deny such cause of action would be controlling.' *Cort,* 422 U.S. at 82, [45 L.Ed.2d 26, 95 S.Ct. 2080 at 2089] (emphasis in original). 441 U.S. at 694, 60 L.Ed.2d 560, 99 S.Ct. 1946 [at 1956].

I find no such intent to foreclose private actions. Indeed, the Court recognizes the legislative history of this subsection is "entirely silent" on the question of private rights of action; it neither explicitly nor implicitly indicates that Congress intended to deny private damages actions to aliens who are arrested and detained in violation of this statute. The second prong of the *Cort* test, I find, has been satisfied.

The third portion of the *Cort* standard requires consideration of the compatibility of a private right of action with the legisla-

tive scheme. While private remedy will not be implied to the frustration of the legislative purpose, "when that remedy is necessary or at least helpful to the accomplishment of the statutory purpose, the Court is decidedly receptive to its implication under the statute". *Cannon v. University of Chicago, supra,* 441 U.S. at 703, 99 S.Ct. at 1960. The purpose of this subsection has been previously stated in this Opinion to be the delineation of a warrantless arrest power to officers of the Service to be used in particularized circumstances and conditioned upon certain procedural safeguards. Implication of a private right of action for damages unquestionably would be not only consistent with the legislative goal of requiring an alien so arrested to be examined without unnecessary delay, but also essential to its achievement.

The final consideration under the *Cort* analysis is whether the subject matter of the cause of action has been so traditionally relegated to state law as to make it inappropriate to infer a federal cause of action. Regulation of the activities underscoring the law of immigration is not a traditional state concern, but is instead of singular primary significance to the federal government. This concern, therefore, has no application to the case at bar.

Hence, each of the *Cort* factors points to the implication of a private cause of action in favor of the Plaintiff. The intent of Congress thus discerned pursuant to *Touche Ross & Company* and *Transamerica Mortgage Advisors, Inc.,* I am persuaded that a private cause of action is available. Prior to turning to a discussion of the merits of Plaintiff's Motion, a related inquiry to the above analysis must be made.

In *Davis v. Passman, supra,* 442 U.S. at 239, 99 S.Ct. at 2273, the Supreme Court recognized that "the question of whether a litigant has a 'cause of action' is analytically distinct and prior to the question of what relief, if any, a litigant may be entitled to receive". Once it is found that a statute creates an implied right of action, courts have wide discretion in fashioning available relief. *Sullivan v. Little Hunting*

*Park,* 396 U.S. 229, 239, 90 S.Ct. 400, 405, 24 L.Ed.2d 386 (1969). ("The existence of a statutory right implies the existence of all necessary and appropriate remedies"). As the Supreme Court stated in *Bell v. Hood,* 327 U.S. 678, 684, 66 S.Ct. 773, 776, 90 L.Ed. 939, 13 A.L.R.2d 383 (1946) "where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." Thus, in the absence of any contrary indication by Congress, courts may provide private litigants, exercising implied rights of action, whatever relief is consistent with the Congressional purpose. *J. I. Case Company v. Borak,* 377 U.S. 426, 84 S.Ct. 1556, 12 L.Ed.2d 423 (1964); *Securities Investor Protection Corporation v. Barbour,* 421 U.S. 412, 424, 95 S.Ct. 1733, 1740, 44 L.Ed.2d 263 (1975). In the case *sub judice* it is apparent that not only declaratory relief, but also relief in damages is appropriate assuming arguendo that Plaintiff can maintain the instant statutorily based cause of action.

The Court must now consider those issues raised by the Plaintiff in his Motion for Partial Summary Judgment. Therein, the Plaintiff raises claims that his statutory rights granted under the Immigration and Nationality Act, including the regulations and operating instructions thereunder, were violated, as he was not:

(a) afforded a timely determination of lawful custody by an examining officer pursuant to 8 U.S.C. § 1357(a)(2), 8 CFR § 287.3,

(b) informed that a decision would be made within 24 hours or less as to whether he would be continued in custody or released on bond or recognizance pursuant to 8 U.S.C. § 1357(a)(2), 8 CFR § 287.3,

(c) informed of his right to counsel of his choice pursuant to 8 U.S.C. § 1357(a)(2), 8 CFR § 287.3,

(d) informed that any statement he made could be used against him pursuant to 8 U.S.C. § 1357(a)(2), 8 CFR § 287.3,

(e) provided a listing of free legal services programs pursuant to 8 CFR § 292a.

■ As already noted, § 1357(a)(2) places a requirement upon an officer of the Service who makes a warrantless arrest to take the arrested alien without delay for examination before an officer of the Service having authority to examine aliens regarding their right to enter or remain in this country. The regulations contained in 8 CFR § 287.3 set forth in more specific terms those steps which INS officers are required to take, and those procedural rights of which the arrested alien must be informed.[3] That regulation provides:

> An alien arrested without a warrant of arrest under the authority contained in section 287(a)(2) of the Immigration and Nationality Act shall be examined as therein provided by an officer other than the arresting officer, unless no other qualified officer is readily available and the taking of the alien before another officer would entail unnecessary delay, in which event the arresting officer, if the conduct of such examination is a part of the duties assigned to him, may examine the alien. If such examining officer is satisfied that there is prima facie evidence establishing that the arrested alien was entering or attempting to enter the United States in violation of the immigration laws, he shall refer the case to an immigration judge for further inquiry in accordance with Parts 235 and 236 of this chapter or take whatever other action may be appropriate or required under the laws or other regulations applicable to the particular case. If the examining officer is satisfied that there is prima facie evidence establishing that the arrested alien is in the United States in violation of the immigration laws, further action in the case shall be taken as provided in Part 242 of this chapter. After the examining officer has determined that formal proceedings under sections 236, 237, or 242 of the Act, will be instituted, an alien arrested without warrant of arrest shall be advised of the reason of his arrest and his right to be represented by counsel of his own choice, at no expense to the Government. He shall also be provided with a list of the available free legal services programs qualified under Part 292a of this chapter and organizations recognized pursuant to § 292.2 of this chapter, located in the district where his deportation hearing will be held. It shall be noted on Form I-213 that such a list was provided to the alien. He shall also be advised that any statement he makes may be used against him in a subsequent proceeding and that a decision will be made within 24 hours or less as to whether he will be continued in custody or released on bond or recognizance. Unless voluntary departure has been granted pursuant to § 242.5 of this chapter, the alien's case shall be presented promptly, and in any event within 24 hours, to the district director, acting district director, deputy district director, assistant district director for investigations, officers in charge at Agana, GU; Albany, NY; Charlotte Amalie, VI; Cincinnati, OH; Hammond, IN; Milwaukee, WI; Norfolk, VA; Oklahoma City, OK; Pittsburgh, PA; Providence, RI; Salt Lake City, UT; St. Louis, MO; Spokane, WA for a determination as to whether there is prima facie evidence that the arrested alien is in the United States in violation of law and for issuance of an order to show cause and warrant of arrest prescribed in Part 242 of this chapter.

Each of the claims raised by Plaintiff as they relate to this regulatory provision will be addressed below. It is noted that these claims merely require the Court to consider these statutory and regulatory provisions in view of the events which transpired in July of 1979.

### Right to Counsel

Prior to interrogating Plaintiff over the phone, Deputy Chief Patrol Agent Duck-

---

**3.** It is well settled that an administrative agency must adhere to its own rules and regulations as a matter of procedural rights guaranteed by the regulations themselves, *Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), or as rooted in the Fifth Amendment due process clause, *Hollingsworth v. Balcom*, 441 F.2d 419 (CA 6 1971).

ham knew that Plaintiff was in custody and suspected of "illegal entry" since Police Chief Baldwin had previously notified him of that status. Duckham was also informed by Baldwin that Plaintiff was in custody. Inexplicably, Duckham proceeded to question and interrogate the Plaintiff without advising him of any rights in general or of his specific rights as set forth in 8 CFR § 287.3, above. That regulation specifically includes the right to be represented by counsel of Plaintiff's own choice, at no expense to the Government, or to be provided with a list of the available free legal services programs located within the district. The language of this regulation absolutely imposes a duty upon the examining officer to advise an arrested alien of his right to counsel. Here, Duckham failed to observe this and thereby acted to deprive Plaintiff of an opportunity to meaningfully exercise his right to retain counsel. Meticulous care in implementing the procedure outlined in this regulation was conspicuously absent.[4] See also *Yui Fong Cheung v. I. N. S.*, 418 F.2d 460, 465 (CADC 1969).

### Incriminating Statements

8 CFR § 287.3 explicitly announces that an arrested alien shall "be advised that any statement he makes may be used against him in a subsequent proceeding..." In the instant case, as previously mentioned, Defendant Duckham did not advise Plaintiff of any rights, let alone his right to remain silent. This information was not provided until the time of the face-to-face interview by other officers of the Service, which took place two days after his arrest. As found concerning the regulatory duty to be advised of a right to counsel, meticulous care with respect to the duty to advise Plaintiff of his right to remain silent, was, on the facts as stipulated, conspicuously absent.

### 24 Hour Incarceration Period

The regulation at issue specifically contemplates that an arrested alien will be advised that "a decision will be made within 24 hours or less as to whether he will be continued in custody or released on bond or recognizance". Instead of informing Plaintiff that such a decision would be made within this time period, Duckham instructed Baldwin to lodge the Plaintiff in the Van Buren County Jail for an indeterminate period of time, thereby subjecting Plaintiff to a measure of invidious uncertainty which the regulation was drafted to prevent. In so acting the procedures outlined by 8 CFR § 287.3 were not implemented with meticulous care and Plaintiff's rights were violated.

### Examination Within 24 Hours

The phrase "unnecessary delay" contained within § 1357(a)(2) of Title 8 of the US Code was given meaning in 8 CFR § 287.3 by requiring that certain steps be taken within 24 hours or less. Those steps are set forth as follows:

Unless voluntary departure has been granted pursuant to § 242.5 of this chapter, the alien's case shall be presented promptly, *and in any event* within 24 hours, to the district director, deputy district director, assistant district director for investigations ... for a determination as to whether there is prima facie evidence that the arrested alien is in the United States in violation of law and for issuance of an order to show cause and warrant of arrest prescribed in Part 242 of this chapter. (Emphasis supplied).

In this case, it is undisputed that Plaintiff was arrested on July 11, 1979 and therefore no Service officer was sent to process him until July 13, 1979; a time period clearly in excess of that prescribed above. Furthermore, regardless of whether Plaintiff was granted voluntary departure or not, as asserted by the INS, the language in § 287.3 to the effect that; "in any event" the arrested alien will be presented within 24 hours, establishes an absolute duty to present all aliens, even those who have been granted voluntary departure, within 24 hours before one of the class of

---

4. See for example *Bridges v. Wixon*, 326 U.S. 135, 154, 65 S.Ct. 1443, 1452, 89 L.Ed. 2103 (1945) and *Attoh v. Immigration and Naturalization Service*, 606 F.2d 1273 (CA 6 1979).

officers enumerated in § 287.3. This duty was breached as soon as Plaintiff remained detained beyond 24 hours without having been so processed.[5]

It also appears that Plaintiff was detained in contravention of the directive of Gordon Ruth, who on July 11, 1979 was the Service Regional Commissioner for the Northern Region; a jurisdictional area which includes the State of Michigan. Exhibit 12 attached to Plaintiff's brief discloses that on January 10, 1978, Ruth informed all district directors and officers in charge within the Northern Region and chief patrol agents therein, via a memorandum, of the Service policy pertaining to apprehension and detention of aliens determined to be illegally in the United States. The policy statement provides in pertinent part:

> It has been past practice to conduct a telephonic interview of persons who have been arrested/detained by local enforcement agencies who may be of interest to this Service. There is nothing inherently wrong with this policy. We can and should attempt to ascertain a prima facie case of alienage and deportability via telephone and, if the circumstances warrant, place an immigration hold on that individual. Further, in accordance with 8 CFR 287.3, which states in part that a decision shall be made in each case of an alien so arrested within 24 hours, a face to face interview of each and every alien following such telephonic determination of alienage and prima facie deportability is required. It is and will remain the policy of this Region that within 24 hours of the authorization of an immigration detention, the alien will appear personally either at the place of detention or at a District or Sub-office before any of the following classes of persons: Criminal Investigator, Patrol Agent, Detention/Deportation Officer, Immigration Inspector, Immigration Examiner, or the Supervisor of the foregoing. The purpose herein is to review the facts of alienage and deportability as well as to serve upon the alien the appropriate documentary paperwork as is necessary for each particular case.
>
> *In the event an alien cannot be visually seen and interviewed by one of the foregoing officers within the time period of 24 hours following the arrest, his detention should not be authorized.* The foregoing 24-hour limitation does not apply to those aliens being held by state and local authorities on charges other than violations of the immigration law. (Emphasis supplied)

This memorandum succinctly sets forth the procedure to be followed when an immigration hold is authorized over the telephone for a suspected illegal alien. While this policy is not conclusive on this issue, it does merit consideration and is interpreted by this Court in conjunction with 8 CFR § 287.3.

 It is unquestioned that Plaintiff on July 11, 1979 was detained on an immigration hold at the Hartford Police Station following his interrogation by Defendant Duckham. Indeed the immigration hold was the only reason for Plaintiff's detention. It is also evident that the INS waited until the morning of July 13, 1979, to contact Plaintiff face-to-face so that he might be processed pursuant to the procedures outlined above. This action is contrary to the directives of 8 U.S.C. § 1357(a)(2); 8 CFR § 287.3; and the policy statements issued by Regional Commissioner Ruth. Quite simply, if the procedures therein out-

---

**5.** It also appears that Defendant Duckham was without authority to grant voluntary departure, assuming arguendo that it was granted to Plaintiff. 8 CFR § 242.5(a)(1) enumerates those officers of the Service authorized to grant voluntary departure:

> The authority contained in section 242(b) of the act to permit aliens to depart voluntarily from the United States may be exercised by district directors, district officers who are in charge of investigations, officers in charge, and chief patrol agents.

On July 11, 1979, William L. Duckham was not employed by the Service or performing duties in any of the capacities set forth in section 242.5, but was instead the Deputy Chief Patrol Agent for the United States Border Patrol, Detroit Office. In this capacity, Duckham did not have the authority to authorize voluntary departure for the Plaintiff.

lined could not have been implemented within 24 hours then the Plaintiff should not have been detained.

Based on the foregoing, I am constrained to conclude that the Plaintiff's statutory rights were infringed. This Court, as well as any court of justice, cannot condone governmental actions which transgress and ignore those rights which Congress has seen fit to create. Accordingly, the Plaintiff's Motion for Partial Summary Judgment is granted, the Court however reserving for consideration the constitutional assertion raised, and the Motion for Summary Judgment filed by the INS is denied. All parties are hereby directed to forthwith file trial briefs with this Court.