**In re GIBRALCO, INC., Debtor.**

**Bankruptcy No. LA 83–7806–JD.**

United States Bankruptcy Court,
C.D. California.

Sept. 23, 1985.

Clark & Trevithick, Los Angeles, Cal., for trustee.

Stephen Harbeck, Securities Investor Protection Corp., Washington, D.C., for SIPC.

James M. Gansinger, Gansinger & Pick, Los Angeles, Cal., for Anthony Marturano.

James M. Fizzolio, Fizzolio, Fizzolio & McLeod, No. Hollywood, Cal., for Louis J. Bonanno.

## MEMORANDUM OF DECISION

JAMES R. DOOLEY, Bankruptcy Judge.

Before the court for decision are the oppositions of Anthony Marturano ("Marturano") and Louis J. Bonanno ("Bonanno") to the trustee's disallowance of their claims under the Securities Investor Protection Act of 1970 (SIPA), 15 U.S.C. § 78aaa *et seq.* The crucial issue in each case is whether the claimant (Marturano or Bonanno) was a customer of the debtor, Gibralco, Inc. ("Gibralco") with respect to his claim within the meaning of the Act.

### FACTS

#### *In General*

Marturano and Bonanno are two out of a number of victims of a fraudulent scheme by Steven R. Grayson ("Grayson") who, at the time of the events here involved, was a municipal bond salesman for Gibralco. The scheme was generally carried out as follows. Grayson, who was an avid gambler, would obtain bonds from a customer of Gibralco, allegedly for the purpose of "upgrading" these bonds, that is, exchanging them for bonds having a higher market value. However, instead of putting these bonds in the customer's account at Gibral-

co, Grayson would put them in a fictitious account which he had established at Gibralco under the name "S.R. Grayson" (the "S.R. Grayson account").[1] When he needed money for gambling, Grayson would sell bonds which were in the S.R. Grayson account through Gibralco. And if he was successful in his gambling, he would use his winnings to buy new bonds.

· Grayson's fraud was eventually discovered; and on October 25, 1982 he was convicted on his plea of guilty of mail fraud and securities fraud in the United States District Court for the Central District of California.

On June 21, 1983 the Securities Investor Protection Corporation and the Securities and Exchange Commission filed an action in the United States District Court for the Central District of California against Gibralco requesting, *inter alia,* an order directing that Gibralco be liquidated under the custodianship of a trustee pursuant to SIPA. On June 22, 1983 the District Court entered its order that Gibralco be liquidated, appointed a trustee and transferred the action to this court.

### Transactions With Marturano

At the time of the transactions here involved, Marturano had known Grayson, and had used his services as a municipal bond salesman, for between ten and fifteen years. Grayson was employed by Stern Brenner & Co. of Beverly Hills from about November 1968 to about January 1973, with MuniciCorp. of California from January 1973 to June 1979 and with Gibralco from about June 1979 to about December 31, 1981. Marturano first used Grayson's services while the latter was employed by Stern Brenner & Co. and continued to use Grayson's services at his subsequent places of employment.

The following transactions with Marturano while Grayson was employed by Gibralco are relevant:

1. On trade date January 8, 1980, settlement date January 25, 1980, Marturano purchased and paid for through his account at Gibralco $100,000 Chula Vista Redevelopment Agency bonds, Bayfront Twin Center Project, at 8.0% due April 1, 2007 (the "Chula Vista bonds"), for a net amount of $93,413.33 which includes $90,880 principal and $2,533.33 accrued interest. On or about January 30, 1980, these bonds were delivered to Marturano.

2. In or about April 1980, Marturano redelivered the Chula Vista bonds to Grayson, and Grayson issued a handwritten receipt therefor. The Chula Vista bonds were never redeposited into Marturano's account at Gibralco and Marturano never received any document from Gibralco acknowledging receipt of these bonds. On April 21, 1980, the Chula Vista bonds were deposited by Grayson with Gibralco in the S.R. Grayson account. On trade date April 14, 1980, for settlement date April 21, 1980, the Chula Vista bonds were sold by Grayson through the S.R. Grayson account for a net amount of $77,525.44 which includes $73,081 principal and $4,444.44 accrued interest. Said $77,525.44 was subsequently paid by Gibralco to S.R. Grayson.

3. On or about July 10, 1980, Marturano delivered to Grayson and Grayson issued a handwritten receipt therefor, $45,000 par value San Bernardino Redevelopment Agency bonds at 7.2% due March 1, 2005 (the "San Bernardino bonds"). The San Bernardino bonds were never deposited into Marturano's account at Gibralco and Marturano never received any document from Gibralco acknowledging receipt of these bonds. On July 17, 1980, the San Bernardino bonds were deposited by Grayson with Gibralco in the S.R. Grayson account. On trade date July 10, 1980, for settlement date July 17, 1980, the San Ber-

---

**1.** Charles Gunther, Grayson's superior at Gibralco, testified that Grayson told him that the S.R. Grayson Account was established so that his father could trade in bonds. However, Grayson himself testified that he told officials at Gibralco that the S.R. Grayson account was a family account. Grayson also had another fictitious account at Gibralco in the name of "Michael Scott". Grayson's son was named Michael Scott Grayson.

nardino bonds were sold by Grayson through the S.R. Grayson account for a net amount of $32,346 which includes $31,122 principal and $1,224 accrued interest. Said $32,346 was subsequently paid by Gibralco to S.R. Grayson.

4. On trade date September 9, 1980, for settlement date October 17, 1980, Grayson purchased through Marturano's account at Gibralco $25,000 par value Pomona Redevelopment Agency bonds at 10.0% due September 1, 2013 (the "Pomona bonds") for a net amount of $25,319.44 which includes $25,000 principal and $319.44 accrued interest. On or about February 5, 1981, the Pomona bonds were delivered to Marturano.

5. On trade date March 23, 1981, for settlement date March 31, 1981, Grayson purchased through Marturano's account at Gibralco $25,000 par value Barstow Redevelopment Agency bonds at 10.0% due September 1, 1984 (the "Barstow bonds") for a net amount of $25,208.33 which includes $25,000 principal and $208.33 accrued interest. On or about May 15, 1981, the Barstow bonds were delivered to Marturano.

6. On trade date June 16, 1981, for settlement date June 30, 1981, Grayson purchased through Marturano's account at Gibralco $25,000 Huntington Park Redevelopment Agency bonds at 10.0% due June 1, 1985 (the "Huntington Park bonds") for a net amount of $25,201.39 which includes $25,000 principal and $201.39 accrued interest. On or about August 18, 1981, the Huntington Park bonds were delivered to Marturano.

7. On or about August 27, 1981, Marturano delivered to Grayson the following bonds which he had in his possession: $25,000 par value Los Angeles Community Redevelopment Agency Mortgage Revenue bonds at 9.0% due January 15, 2014 (the "Los Angeles bonds"); $10,000 par value Pico Rivera Redevelopment Agency bonds at 8.0% due May 1, 1995 (the "Pico Rivera bonds"); $10,000 par value Inglewood Redevelopment Agency bonds at 8.0% due May 1, 1998 (the "$10,000 Inglewood bonds"); and, $5,000 par value Inglewood Redevelopment Agency bonds at 8.0% due May 1, 1995 (the "$5,000 Inglewood bonds").

8. The Los Angeles bonds, the Pico Rivera bonds, the $10,000 Inglewood bonds and the $5,000 Inglewood bonds were never deposited into Marturano's account at Gibralco, and Marturano never received any document from Gibralco acknowledging receipt of these bonds.

9. On September 4, 1981, the Los Angeles bonds were deposited by Grayson with Gibralco in the S.R. Grayson account. On trade date August 27, 1981, for settlement date September 3, 1981, the Los Angeles bonds were sold by Grayson through the S.R. Grayson account for a net amount of $16,855 which includes $16,555 principal and $300 accrued interest. Said $16,855 was subsequently paid by Gibralco to S.R. Grayson.

10. On September 4, 1981, the Pico Rivera bonds were deposited by Grayson with Gibralco in the S.R. Grayson account. On trade date August 27, 1981, for settlement date September 3, 1981, the Pico Rivera bonds were sold by Grayson through the S.R. Grayson account for a net amount of $6,256.11 which includes $5,885 principal and $371.11 accrued interest. Said $6,256.11 was subsequently paid by Gibralco to S.R. Grayson.

11. On September, 4, 1981, the $10,000 Inglewood bonds were deposited by Grayson with Gibralco in the S.R. Grayson account. On trade date August 27, 1981, for settlement date September 3, 1981, the $10,000 Inglewood bonds were sold by Grayson through the S.R. Grayson account for a net amount of $6,256.11 which includes $5,885 principal and $371.11 accrued interest. Said $6,256.11 was subsequently paid by Gibralco to S.R. Grayson.

12. On September 4, 1981, the $5,000 Inglewood bonds were deposited by Grayson with Gibralco in the S.R. Grayson account. On trade date August 27, 1981, for settlement date September 3, 1981, the $5,000 Inglewood bonds were sold by Grayson through the S.R. Grayson account for a

net amount of $3,239.06 which includes $3,103.50 principal and $135.56 accrued interest. Said $3,239.06 was subsequently paid by Gibralco to S.R. Grayson.

13. On trade date September 21, 1981, for settlement date October 14, 1981, Grayson purchased through Marturano's account at Gibralco $25,000 Rancho California Water District General Obligation bonds at 12.0% due October 1, 1995, for a net amount of $25,108.33 which includes $25,000 principal and $108.33 accrued interest.

To summarize, the following bonds were delivered by Marturano to Grayson, but none of these bonds was ever deposited in Marturano's account at Gibralco:

| Bonds | Date Bonds Delivered To Grayson |
| --- | --- |
| $100,000 Chula Vista Bonds | April 1980 |
| $45,000 San Bernardino Bonds | July 10, 1980 |
| $25,000 Los Angeles Bonds | August 27, 1981 |
| $10,000 Pico Rivera Bonds | August 27, 1981 |
| $10,000 Inglewood Bonds | August 27, 1981 |
| $5,000 Inglewood Bonds | August 27, 1981 |

### Transactions With Bonanno

Bonanno had been a customer of Gibralco since 1977; and during the period from 1977 to January 1981 Richard Stonely had been Bonanno's account executive at Gibralco. However, Marturano had recommended to Bonanno that he use Grayson as his account representative; and as a result of this recommendation, Bonanno caused Grayson to replace Stonely as his account executive in January 1981.

The following transactions with Bonanno while Grayson was his account executive are relevant:

1. On July 9, 1981, Bonanno delivered an aggregate of $100,000 par value Pasadena Redevelopment Agency bonds at 7.2% due 11/01/2005 (the "$100,000 Pasadena bonds") to Grayson personally pursuant to a written "Bond Swap Agreement" prepared by Bonanno and signed by Bonanno and Grayson. A copy of this "Bond Swap Agreement" is attached to this Memorandum of Decision as Appendix A.

2. The $100,000 Pasadena bonds were never deposited by Grayson into Bonanno's account at Gibralco; and Bonanno never received any document from Gibralco acknowledging receipt of these bonds.

3. On July 30, 1981, the $100,000 Pasadena bonds were deposited by Grayson with Gibralco in the S.R. Grayson account. On trade date July 16, 1981, the $100,000 Pasadena bonds were sold by Grayson through the S.R. Grayson account for a net amount of $54,490. Said $54,490 was subsequently paid by Gibralco to S.R. Grayson.

4. On September 4, 1981, Bonanno delivered an additional $50,000 par value Pasadena Redevelopment Agency bonds at 7.2% due 11/01/2005 (the "$50,000 Pasadena bonds") to Grayson personally pursuant to an amendment appearing at the bottom of the written "Bond Swap Agreement". The amendment was prepared by Bonanno and signed by Bonanno and Grayson.

5. The $50,000 Pasadena bonds were never deposited by Grayson into Bonanno's account at Gibralco and Bonanno never received any document from · Gibralco acknowledging receipt of these bonds.

6. On September 4, 1981, the $50,000 Pasadena bonds were deposited by Grayson with Gibralco in the S.R. Grayson account. On trade date August 25, 1981, for settlement date September 1, 1981, the $50,000 Pasadena bonds were sold by Grayson through the S.R. Grayson account for a net amount of $25,825. Said $25,825 was subsequently paid by Gibralco to S.R. Grayson.

### LEGAL ANALYSIS

#### In General

In *Securities Investor Protection Corp. v. Barbour*, 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975) the Supreme Court expressed the purposes of SIPA in the following language (p. 415, 95 S.Ct. p. 1736):

"Following a period of great expansion in the 1960's, the securities industry experienced a business contraction that led to the failure or instability of a significant number of brokerage firms. Cus-

tomers of failed firms found their cash and securities on deposit either dissipated or tied up in lengthy bankruptcy proceedings. In addition to its disastrous effects on customer assets and investor confidence, this situation also threatened a 'domino effect' involving otherwise solvent brokers that had substantial open transactions with firms that failed. Congress enacted the SIPA to arrest this process, restore investor confidence in the capital markets, and upgrade the financial responsibility requirements for registered brokers and dealers. S Rep No. 91–1218, pp 2–4 (1970); HR Rep No. 91–1613, pp 2–4 (1970)."

15 U.S.C. § 78*lll* provides in part:

"§ 78*lll*. Definitions

For purposes of this chapter, including the application of the Bankruptcy Act to a liquidation proceeding:"

\*      \*      \*      \*      \*      \*

"(2) Customer.—The term 'customer' of a debtor means any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term 'customer' *includes any person who has a claim against the debtor arising out of sales or conversions of such securities*, and any person who has deposited cash with the debtor for the purpose of purchasing securities . . ." [Emphasis Added]

It has been said that a person may be a customer with respect to some of his claims but not with respect to others. *In Re Stalvey and Assoc., Inc.*, 750 F.2d 464, 467, 471 (5th Cir.1985); *S.E.C. v. F.O. Baroff Co., Inc.*, 497 F.2d 280, 282 (2nd Cir.1974), footnote 2. As the court in *In Re Stalvey and Assoc., Inc., supra*, declared (p. 471):

"The statute, however, designed relief predicated upon the specific securities or transactions for which a claim is made. Id. § 78fff(c). Wise's customer status in the course of some dealings with a broker will not confer that status upon other dealings, no matter how intimately related, unless those other dealings also fall within the ambit of the statute. The Act contemplates that a person may be a "customer" with respect to some of his claims for cash or shares, but not with respect to others.' *S.E.C. v. F.O. Baroff Co.*, 2 Cir.1974, 497 F.2d 280, 282 n. 2. Customer status 'in the air' is insufficient to confer the SIPA's protection on a given transaction."

### As To Marturano

While the question is not free from doubt, this court concludes that Marturano was a customer of Gibralco within the meaning of 15 U.S.C. § 78*lll*(2) with respect to the bonds which he entrusted to Grayson during April 1980, on July 10, 1980, and on August 27, 1981, even though these bonds were never deposited in Marturano's account at Gibralco, and even though Gibralco never issued a formal receipt for these bonds. Cf. *SEC v. Ambassador Church*, 679 F.2d 608 (6th Cir.1982); *In Re First State Securities Corp.*, 34 B.R. 492 (Bkrtcy.S.D.Fla.1983); *Matter of Investors Security Corp.*, 30 B.R. 214 (Bkrtcy. W.D.Pa.1983).

It is undisputed that the bonds entrusted by Marturano to Grayson were deposited in the S.E. Grayson account at Gibralco; that these bonds were sold by Grayson through Gibralco; and that Gibralco paid the proceeds of the various sales to Grayson. While Grayson's fraud might have been discovered earlier if Marturano had been more circumspect in examining the statements sent to him by Gibralco and in insisting upon a formal receipt for the entrusted bonds from Gibralco, this lack of diligence on his part should not deprive him of customer status. As the court in *SEC v. Ambassador Church, supra*, said (p. 614):

"... It is not likely that Congress, in seeking to protect the assets of small transaction customers of broker-dealers, intended to make eligibility for protection depend on whether the broker complied with rules of the SEC or practices of the trade. These are matters over which the broker has complete control. The trusting customer is not to be penalized for choosing a careless, unethical or dishonest broker. The primary purpose of the Act is to assure the unsophisticated participant in securities transactions that there is protection when a bad choice of brokers is made."

Courts should endeavor to give statutory language that meaning that nurtures the policies underlying the legislation. *SEC v. Ambassador Church, supra,* at pp. 611–612. One of the objectives of SIPA was to "restore investor confidence in the capital markets". *Securities Investor Protection Corp. v. Barbour, supra,* 421 U.S., at p. 415, 95 S.Ct. at p. 1736. In the view of this court, it would erode investor confidence in the capital markets and thus tend to undermine one of the objectives which Congress sought to achieve, if Marturano were held not to be a customer as to the bonds which he entrusted to Grayson in this case.

█ The exact amount to which Marturano is entitled is rendered somewhat complicated by reason of the fact that Grayson bought certain new bonds and either delivered them to Marturano or put them in his account.[2] The court will withhold making a determination of the exact amount to be paid to Marturano until after a proposed judgment has been lodged with the court. It should be noted, however, that under SIPA Marturano is not entitled to recover damages for fraud or for breach of contract. *In Re M.V. Securities, Inc.,* 48 B.R. 156, 160 (Bkrtcy.S.D.N.Y.1985).

This Memorandum of Decision shall constitute findings of fact and conclusions of law as to Marturano. Counsel for Marturano is directed to serve and lodge an appropriate judgment consistent with the foregoing.[3]

### As To Bonanno

The court also concludes that Bonanno was a customer of Gibralco within the meaning of 15 U.S.C. § 78*lll*(2) with respect to the bonds entrusted to Grayson on July 9, 1981, and September 4, 1981 even though these bonds were never deposited in Bonanno's account at Gibralco, and even though Gibralco never issued a formal receipt for these bonds. The reasoning and authorities in the preceding discussion relating to Marturano are equally applicable to Bonanno. It is undisputed that the bonds entrusted by Bonanno to Grayson were deposited in the S.E. Grayson account at Gibralco; that these bonds were sold by Grayson through Gibralco; and that Gibralco paid the proceeds of the various sales to Grayson. While Grayson's fraud might have been discovered earlier if Bonanno had been more circumspect in carefully examining the statements sent by Gibralco to him and in insisting upon a formal receipt for the entrusted bonds from Gibralco, this lack of diligence on his part should not deprive him of customer status.

The court will also withhold making a determination of the exact amount to be paid to Bonanno until after a proposed judgment has been lodged with the court. Here again, it should be emphasized that under SIPA Bonanno is not entitled to recover damages for fraud or for breach of contract. *In Re M.V. Securities, Inc., supra,* at p. 160. This rule would seem to be particularly applicable to Bonanno's claim that he is entitled to recover because he did not receive the Rancho California Water District Lease Revenue 12% bonds which

---

2. Terrence M. Carey, a municipal financial consultant testifying for Marturano, concluded that as of August 29, 1984 Marturano was owed $125,211.00.

3. The court has been unable to locate in the record a copy of the trustee's determination denying Marturano's claim. The court will take judicial notice of this document; however, the trustee should file a copy of the document with the court as soon as possible.

Grayson purchased under the fictitious name of Michael Scott.

This Memorandum of Decision shall constitute findings of fact and conclusions of law as to Bonanno. Counsel for Bonanno is directed to serve and lodge an appropriate judgment consistent with the foregoing.[4]

## APPENDIX A
### BOND SWAP AGREEMENT

AS REGARDS THIS BOND SWAP AGREEMENT DATED JULY 9, 1981, I DO HEREBY AGREE:

TO PAY TO LOUIS J. BONANNO ALL ACCRUED INTEREST ON THE BONDS SURRENDERED TO ME (PASADENA REDEVELOPMENT AGENCY $100,000.00 7.20% 2005 MATURITY)

2. TO EXCHANGE SUBJECT BONDS FOR A TOTAL FACE VALUE OF LIKE AMOUNT OF $100,000.0 AS REGARDS ONE ISSUE OR TWO DIFFERENT ISSUES OF $50,000.00 EACH, RE REPLACEME

3. THE REPLACEMENT ISSUES SHALL BEAR COUPON INTEREST RATES OF NOT LESS THAN 10% FOR INTERMEDIATE MATURITIES (10-15 YEARS) AND UPWARD TO 13% FOR LONGER TERM MATURITIES.

4. ALL OF THE ABOVE OUTLINED SHALL BE EFFECTED AT NO COST TO LOUIS J. BONANNO. THAT IS, THAT ANY PRICE DIFFERENCE, INTEREST COUPON DIFFERENCE AND RATING DIFFERENCE ON ALL THE BONDS REPLACED IN THIS SUBJECT BOND SWAP AGREEMENT SHALL BE BORNE BY ME AND ANY PROFITS THAT I MAY GENERATE ON THIS TRANSACTION SHALL BE ACCOMPLISHED THROUGH THAT EXPERT AND PROFESSIONAL WORK EFFORT THAT I MAY BE ABLE TO EFFECT AS A LICENSED BOND AND SECURITIES REPRESENTATIVE IN THE STATE OF CALIFORNIA AND IN THE EMPLOY OF GIBRALCO COMPANY.

IF ANY PORTION OF THIS SUBJECT BOND SWAP IS NOT REPLACED BY AUGUST 9, 1981, THEN THAT UNPLACED PORTION SHALL BE RETURNED TO LOUIS J. BONANNO WITH ALL ACCRUED INTEREST TO DATE. IT IS FURTHER STIPULATED THAT THE OPTION TO EXTEND THE AUGUST 9,1981 DATE MAY BE EXERCISED BY LOUIS J. BONANNO AT THAT TIME. SAL OR EXCHANGE FOR LIKE ISSUE OF ANY ENTRUSTED BONDS PRECLUDE ANY RETURN IN WHC OR IN PART OF BONDS ENTRUSTED & BINDS ME & GIBRALCO CO. RE: #2-3 OUTLINED ABOVE, TO IMMEDIATE PERFORMANCE.

SERIAL BONDS #'S ENTRUSTED & VALUED @ $5,000 EACH: A-3457-3458-3459-3460-3461-3462-3463 & A-5267-5268-5269-5085-3471-3472-3473-3474- A-3475-3476-3477-3478-3479

STEVE GRAYSON

ABOVE AGREED TO:
LOUIS J. BONANNO

### AMENDMENT

THIS AMENDMENT DATED SEPTEMBER 4, 1981 MODIFIES THE BOND SWAP AGREEMENT DATED JULY 9, 1981, ONLY TO THE EXTENT REGARDING THE TOTAL AMOUNT OF BONDS BEING SWAPPED. THE TOTAL CORRECT SUM IS $150,000.00 INSTEAD OF ABOVE STATED $100,000.00. ALL OTHER CONDITIONS CONTAINED IN THE BOND SWAP AGREEMENT DATED JULY 9, 1981 REMAIN IN TACT.

ADDITIONAL BONDS #'S ENTRUSTED & VALUED @ $5,000 EACH: A-2057-2503-4807-4808-4809-4055-4056 A-4057-4058 & 4059.

STEVE GRAYSON

ABOVE AGREED TO:
LOUIS J BONANNO

4. With respect to Bonanno the court has been unable to locate in the record either the claim filed by Bonanno with the trustee or the trustee's determination disallowing that claim. The court will take judicial notice of these documents; however, the trustee should file copies with the court as soon as possible.